THOMAS J. CARROLL & SON CO. v. McILVAINE & BALDWIN.

(Circuit Court of Appeals, Second Circuit. November 18, 1910.)

No. 56.

1. TRADE-MARKS AND TRADE-NAMES (§ 86*) — SUIT FOR INFRINGEMENT — LACHES.

Delay in bringing suit for infringement of a trade-mark, which would bar the right to recover damages for prior infringement, will not necessarily constitute such laches as to preclude relief in equity against further infringement; the matter being within the discretion of the court, to be exercised in view of the circumstances of the particular case.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 95; Dec. Dig. § 86.*

Laches as a defense in suits for infringement, see notes to Taylor v. Sawyer, Spindle Co., 22 C. C. A. 211; Richardson v. D. M. Osborne & Co., 36 C. C. A. 613.]

2. TRADE-MARKS AND TRADE-NAMES (§ 86*)—INFRINGEMENT—RIGHT TO INJUNCTION—LACHES.

Complainant and its predecessors in Baltimore and defendant and its predecessors in New York City, each for more than 30 years, produced and sold a rye whisky under the name of "Baltimore Club." Very little of complainant's whisky was sold in New York until a short time before the suit, and the reputation and market for the brand there was created by defendant. In 1882 complainant's predecessor learned of the use of the name by defendant's predecessor, and called on him in reference thereto; but such use was continued for more than 20 years thereafter without objection from complainant. The labels in general use by the respective parties were quite distinctive and dissimilar; but a short time before the bringing of suit "Baltimore Club" whisky appeared in the New York market bearing complainant's name as maker and with labels on the bottles closely simulating those of defendant. *Held*, that complainant's laches, conceding priority of its use of the name, was such as under the circumstances disentitled it to an injunction restraining defendant from using it in the territory where it had established its business and the reputation of its goods during the intervening years.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 95; Dec. Dig. § 86.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Appeal from the Circuit Court of the United States for the Southern District of New York.

Suit in equity by Thomas J. Carroll & Son Company against McIlvaine & Baldwin, a corporation. Decree (171 Fed. 125) for defendant, and complainant appeals. Affirmed.

C. P. Goepel, for appellant.

Parsons, Closson & McIlvaine (Tompkins McIlvaine, of counsel), for appellee.

Before LACOMBE, WARD, and NOYES, Circuit Judges.

LACOMBE, Circuit Judge. About 10 years ago the predecessors of the parties to this suit were engaged in the sale of whisky; one of them in Baltimore, and the others in New York. Each of them denominated a blend of whisky in which he dealt "Baltimore Club," and his whisky became known among his customers by that name. We are satisfied that neither appropriated the other's name. There is nothing surprising in the circumstance that it occurred to two different persons at about the same time that "Baltimore Club" might be an appropriate and attractive brand for a good grade of whisky. The question presented is, Which first used the words in that way? because the first user, if he did not abandon his use, would be entitled to maintain the trade-mark thus obtained against a later user.

On the part of complainant convincing evidence was produced showing the use of the words "Baltimore Club" by Charles Carroll as a trade-mark on packages containing whisky sold by him as early as April, 1870. This was shown by entries in the books of Carroll, and by the testimony of a clerk employed by him at the time. Carroll himself was dead, and his evidence was not available. We need not discuss this branch of the case, because defendant conceded in his brief that Thomas G. Carroll first used the name "Baltimore Club Rye Whisky" in April, 1870. The testimony shows convincingly that he, the firm of Thomas G. Carroll & Son, and complainant have been ever since selling whisky thus marked, although apparently not in very large quantities. They registered the trade-mark "Baltimore Club" in November, 1874, under the act of 1870, again in June, 1881, under the act of 1881, and again in March, 1906, under the act of 1905.

In view of the concession that April, 1870, was the complainant's earliest date, it will not be necessary to consider so much of defendant's testimony as indicates the use of the name "Baltimore Club" by its predecessors subsequent to that time. The evidence relied on to show an earlier use is meager and unpersuasive. Lapse of time has greatly embarrassed defendant in its efforts to obtain testimony. Reed McIlvaine, who had founded the old firm of McIlvaine & Baldwin, died in 1902. His partner died in 1899. The corporation defendant was formed to take over the old business in 1902. Its president, who had become connected with the old firm in 1888, testified that shortly afterwards the place of business was changed from its former location in Dey street, and the old books of McIlvaine and of McIlvaine & Baldwin were left when they moved. He says:

"Our customers had changed a good deal, and the books were not complete, entirely; so we left the old books, thinking they were of no value, together with several old safes. The safes were sold, and the books left there. That was about 1903."

Whatever employés may have been with the firm during its early years had presumably died or disappeared. None of them was produced. Two personal friends of Mr. McIlvaine were called to the stand. One of them, Mr. Wells, testified that McIlvaine & Baldwin became partners prior to the death of the witness' brother in 1871, and that before that Reed McIlvaine was in the wine and liquor business under his own name. Asked what is his recollection as to "Baltimore Club" whisky, he said:

"Well, it seems that as long as I recollect Mr. McIlvaine being in the business I recollect Baltimore Club. I never drank whisky before 1875; therefore, I could not say the exact date; but I know then I drank it."

The other witness was Mr. McCullagh. He was the son-in-law of Mr. Thomas McMullen, a wine merchant, who started McIlvaine in business; the latter having sold wines for McMullen on commission since about the year 1865. Witness himself went into business January 1, 1868, which enables him to fix the date when he first came in touch with Mr. McIlvaine as either 1868 or 1869. Asked when he recollects first seeing "Baltimore Club" whisky, he answered:

"It is hard to tell that. It is an awful long time ago. I remember seeing it in Mr. McMullen's office. He kept it for his own use in a little cupboard, a little locker behind his desk. He got it from Mr. McIlvaine—McIlvaine & Baldwin."

This comes very far short of proving commercial dealing in whisky thus branded. For aught that appears, the bottle in Mr. McMullen's desk may have been one submitted to him for his opinion as a practical business man whether or not the proposed name would be sufficiently attractive to be worth pushing on the market.

This is all the testimony relied on to show an earlier use by defendant's predecessor, and we do not find in it sufficient to antedate the commercial use by Mr. Carroll of "Baltimore Club" as a trademark for whisky in April, 1870, which, as we have seen, is clearly established by uncontroverted testimony.

It is contended by defendant that the delay in bringing this suit, which was begun in 1907, constitutes such laches as should require a dismissal of the bill. The firm of Thomas G. Carroll & Son was formed to take over the business of Thomas G. Carroll in 1895. The successor corporation was formed in 1904. Mr. Carroll knew of Messrs. McIlvaine & Baldwin's dealings in so-called "Baltimore Club" whisky in 1882, and it is apparent that McIlvaine & Baldwin have been continuing such dealings ever since. This would seem to be sufficient to disentitle complainant to a decree for an accounting; but the question whether its delay will also disentitle it to injunctive relief calls for a more careful examination of the law and the facts.

The Supreme Court, in Menendez v. Holt, 128 U. S. 541, 9 Sup. Ct. 145, 32 L. Ed. 526, held that in that case:

"Delay in bringing suit there was, and such delay as to preclude recovery of damages for prior infringement; but there was neither conduct nor negligence which could be held to destroy the right to prevention of further injury."

It seems impossible to make out from the report how long the delay was in the Menendez Case. In its opinion the court says:

"The intentional use of another's trade-mark is a fraud; and when the excuse is that the owner permitted such use, that excuse is disposed of by affirmative action to put a stop to it. Persistence then in the use is not innocent; and the wrong is a continuing one, demanding restraint by judicial interposition when properly invoked. Mere delay or acquiescence cannot defeat the remedy by injunction in support of the legal right, unless it has continued so long and under such circumstances as to defeat the right itself. Where consent by the owner to the use of his trade-mark by another is to be inferred from his knowledge and silence merely, it lasts no longer than the silence from which it springs. It is, in reality, no more than a revocable license."

This broad language is, however, qualified in the next succeeding paragraph:

"At the same time, as it is in the exercise of a discretionary jurisdiction that the doctrine of reasonable diligence is applied, and those who seek equity must do it, a court might hesitate as to the measure of relief, where the use by others, for a long period, under assumed permission of the owner, had largely enhanced the reputation of a particular brand."

The distinction thus indicated is well illustrated by the action of the same court when the group of "Hunyadi" cases came before it 12 years later. Saxlehner v. Eisner, 179 U. S. 19, 21 Sup. Ct. 7, 45 L. Ed. 60; Saxlehner v. Nielsen (and other cases) 179 U. S. 43 et seq. 21 Sup. Ct. 16, 45 L. Ed. 77. It was shown that the various defendants had for many years gotten up packages closely simulating the shape and color of bottle, the style of capsule, and the collocation of colors, blue and red, with medallions and lettering on the labels, which were distinctively characteristic of the original package which Saxlehner had introduced into this country, as indicating that the contents of the bottle came from his spring of bitter water at Buda-Pesth. Manifestly this simulation was a deliberate scheme to palm off on the public bitter water from other springs as the water of complainant's. Although for 20 years the Saxlehners had done nothing to stop this infringement of their rights, the court held that, nevertheless, they were entitled to injunctive relief against this simulation of their packages. At the same time it refused such relief against the use of the word "Hunyadi" to designate the waters of other springs from which defendants drew their supply, and which had been on sale under that name in this country, defendants believing they had a right to use it as a trade-name, for many years.

"These waters," says the court, "found their way to the United States and were put on sale here with the knowledge of the Apollinaris Company (the agent of Saxlehner). There is no evidence that Saxlehner had personal knowledge of these infringements; [but] he was bound to know the law of this country, and to take steps within a reasonable time to vindicate his rights. If he had intended to assert his rights under the laws of this country to the exclusive use of the word 'Hunyadi,' he was bound to act with reasonable promptness."

In the case at bar the only controversy is as to the exclusive use of the words "Baltimore Club" as a trade-mark for whisky. Except for an instance referred to below, there has never been any resemblance between the labels or wrappings used by the parties.

As was stated before, Carroll was located in Baltimore and McIlvaine in New York. It is therefore quite likely that for a considerable time both might have sold whisky under the name "Baltimore Club," without either knowing what the other was doing. There is positive proof, however, that in 1882 both were advised as to the situation. Harry J. Carroll testified that in that year he went with his father and brother to Mr. McIlvaine's place of business in New York. He was then 18 years of age. His father told him the visit was for the purpose of notifying McIlvaine & Baldwin to discontinue the use of "Baltimore Club," and that he wanted him to listen to the conversation. He did not testify what was said on that occasion, and was not asked to do so. His brother, Charles J. Carroll, aged 21 in 1882, testified to being present at this conversation. He states that his father told Mr. McIlvaine that the whisky he was selling under the name "Baltimore Club" was a brand that belonged to him (Thomas Carroll), and that he would have to discontinue selling it under that brand unless he purchased it from him; that Mr. McIlvaine replied that "he had a large supply on hand, and when his stock was depleted he would purchase from them." They also talked about business, and in a little while the Carrolls left. A Mr. Jones is said to have been present at this conversation; but the complainant's witnesses have not been able to give information sufficient to identify him. As we have seen, the younger Carroll, although he was 18 at the time, and had been brought to New York expressly to listen to the conversation, was not asked to testify to his recollection of it. McIlvaine died 14 years later, and we have not his version of what took place.

The report of the conversation is very meager. The talk about the business, which is not detailed, may very well have included statements by McIlvaine as to the circumstances under which he used the words "Baltimore Club" and the time when he began to sell whisky under that name. Possibly something may have been said which satisfied the elder Carroll that it would be good policy to assent to the suggestion that McIlvaine would buy from him only after he had disposed of his present large supply, and which induced him not to undertake to enforce what he believed to be his rights during his lifetime. Assuming the conversation to be just as Charles Carroll gives it, as we must on this record, it amounts merely to a statement that at some time thereafter McIlvaine would buy "Baltimore Club" whisky from Carroll. But within a year or so it became manifest to Carroll that the other had changed his mind and was not going to buy from the former, but would continue to sell his own.

For nearly 20 years, however, no action was taken to prevent defendant's continued sales of "Baltimore Club." During that time the business in New York continued to increase, presumably through the efforts of defendants to make their goods known, until at the time suit was brought their whisky was kept regularly on hand at a dozen

or more of the most prominent clubs and was carried by the leading grocers in this city and vicinity. This New York market for a whisky known as "Baltimore Club" has been created by defendants and their predecessors. Very little of complainant's whisky has been sold here under that name. It is difficult to escape the impression that complainant intentionally refrained from bringing suit until some time after McIlvaine's death, in the hope that by that time so many persons in this city would have acquired the habit of asking for "Baltimore Club" or "B. C.," as it is sometimes referred to, that when it stopped the use of such name by defendant it would itself find a good market outside of Baltimore, the demands of which it could alone supply.

This impression is strengthened by the following circumstance: The label which defendants have used on their bottles for some years is quite distinctive. It is white, with a red circle in the center, containing the words "McIlvaine & Baldwin, New York," and a monogram, all in red. Below in black are words "Bottle number." Above is a large "B" and a large "C" in red, so arranged as to allow the insertion in very much smaller type of the remaining letters required to spell the words "Baltimore Club"—these smaller letters being printed in black. On each side of the label is a list of clubs where the whisky is used, printed in black. For many years prior to 1907 complainants had used a label totally different, with the coat of arms of Baltimore and a description in white embossed letters on a black ground. A few months before suit was begun there appeared on the New York market bottles of whisky bearing labels most closely simulating defendant's; the red center and the monogram containing the name Thomas Carroll & Son, "Baltimore, Md." To a written request from the defendant to be informed whether this was with or without authority of complainant, its counsel replied that he was about to bring suit to prevent the use of the words "Baltimore Club," and added, in reference to the label in imitation of defendant's, "This phase of the matter will not be discussed in this letter," which perhaps was a wise thing to do.

The matter is not discussed in the brief, being dismissed with the suggestion that "this label has not been brought home to the complainant," and that there is "not a scintilla of evidence that appellant was putting out these labels at the time the suit was brought." It seems highly improbable that any outsider would go to the expense of getting up and printing a Thomas J. Carroll & Son label, imitating defendant's, when the Carroll whisky was sold under labels of its own. But there is much more than a mere inference from the fact that whisky with such imitating labels has been found on the market. One Read, a printer of labels, was called for complainant. On cross-examination he testified that within the last two years—he testified in 1908—Mr. Harry Carroll had shown him a bottle with a label containing a large "B" and "C" in red, from the color scheme and arrangement of which he got up a label for Carroll, which he identifies as similar to the one found on the New York market imitating defendant's. He filled an order for these labels and delivered them to Mr. Harry Carroll; but the order was not as large a one as orders

for the black labels which he also printed. It seems to us that this simulating label is sufficiently brought home to complainant.

We are of the opinion that, under all the circumstances of the case, complainant's delay for nearly 20 years is laches which should disentitle it to an injunction against defendant continuing the business it has been engaged in during that period, and that for that reason the bill should have been dismissed. In making such disposition of the case, however, we are not to be understood as expressing any opinion that defendant is entitled to offer whisky for sale under the trade-name of "Baltimore Club" in the city of Baltimore, where complainant solely has been engaged continuously in selling its own whisky under that name, nor elsewhere than in the locality where defendant's business has heretofore been carried on. The conclusions expressed in this opinion sufficiently indicate that the petition in reference to further proof should be denied.

Decree is affirmed, with costs.