THEODORE RECTANUS CO. v. UNITED DRUG CO.

(Circuit Court of Appeals, Sixth Circuit. July 20, 1915. On Petition for Rehearing, November 2, 1915.)

No. 2551.

1. TRADE-MARKS AND TRADE-NAMES €=85—VALIDITY OF TRADE-MARK.
   A trade-mark, attached to a medicinal preparation which may do some good along the line of its advertised benefits, is not invalid merely because the preparation is harmful when an excessive amount thereof is taken.
   [Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 94; Dec. Dig. €=85.]

2. TRADE-MARKS AND TRADE-NAMES €=31—PROPERTY RIGHT IN TRADE-MARK.
   If there is a property right inhering in a trade-mark, perfected by adoption, or by adoption and use, it seems that a later appropriator is a trespasser, though at the time of the later appropriation the prior claimant of the trade-mark had not extended his trade into the later appropriator's territory, and the mere fact that there has been no actual conflict in trade is not a sufficient answer to the prior appropriator's demand for relief.
   [Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 35; Dec. Dig. €=31.]

---

€=For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes
226 F.—35

3. TRADE-MARKS AND TRADE-NAMES ☜63—PROPERTY RIGHT IN TRADE-MARK
—INJUNCTIVE RELIEF.

Claimant's predecessor in business, whose name was Regis, compounded
about 1877 a medicine useful for dyspepsia and some other disorders, and
devised and adopted as a distinguishing name therefor the word "Rex."
This word was used in advertising signs, and marked on the boxes and
packages put on the market, and it became her trade-mark. In 1898 she
registered the word as a trade-mark under the laws of Massachusetts, and
in 1900 the trade-mark was registered in the Patent Office. During more
than 20 years after the adoption of the trade-mark nothing was done
to make the product known outside of the New England states, save spor-
adic sales in territory practically adjacent thereto. No advertising was
intended to reach Kentucky, and no salesman was sent there. Defendant,
ignorant of the trade-mark of complainant or his predecessor, adopted for
its medicine, a blood purifier, the word "Rex." Defendant had been us-
ing the mark in his own trade for more than 15 years, and had expend-
ed several thousand dollars in making the drug known, and had establish-
ed a considerable, though local, business in Louisville, Ky., and vicinity,
and its excursions outside of the local field were inconsiderable. *Held,*
that complainant was not entitled to an injunction to restrain defendant
from using in the future "Rex" in connection with its preparation, and in
the territory already occupied.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent.
Dig. § 77; Dec. Dig. ☜63.

Unfair competition in use of trade-mark or trade-name, see notes to
Scheuer v. Muller, 20 C. C. A. 165; Lare v. Harper & Bros., 30 C. C. A.
376.]

On Petition for Rehearing.

4. TRADE-MARKS AND TRADE-NAMES ☜86—LACHES—ESTOPPEL.

Though the first appropriator's mere laches will not prevent an injunc-
tion against a later appropriator, yet where the mark is one likely to be
adopted by some one else, where it has been so adopted by defendant in
good faith, and expenditure invested in it, and where complainant's neg-
lect to do anything in the way of extending trade or giving notice has
been extreme enough, the principles of estoppel operate to prevent an
injunction.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent.
Dig. § 95; Dec. Dig. ☜86.]

5. TRADE-MARKS AND TRADE-NAMES ☜26—ADOPTION OF TRADE-MARK—PUB-
LICATION.

The duty of one adopting a trade-mark in bringing it at once to the
attention of the public rests on the theory that, in the absence of a
widespread knowledge of the existence of the claim to the mark, others
will be likely to adopt it and spend their money in its promotion in their
own interest, and so the obligation varies with the circumstances of
each case.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent.
Dig. § 29; Dec. Dig. ☜26.]

6. TRADE-MARKS AND TRADE-NAMES ☜45—REGISTRATION UNDER STATE LAW
—EFFECT.

The effect of registration of a trade-mark under the law of a state is
confined to that state.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent.
Dig. §§ 53, 59; Dec. Dig. ☜45.]

7. TRADE-MARKS AND TRADE-NAMES ☜45—REGISTRATION OF TRADE-MARK
UNDER FEDERAL ACT—NOTICE.

Registration under the federal Trade-Mark Act is not actual or con-
structive notice of the rights claimed, though it tends to give notice, since
the substance of the registration is published in an official journal, which

---

☜For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

is regularly scrutinized by many manufacturers and dealers and those proposing to adopt a trade-mark.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. §§ 53, 59; Dec. Dig. ☞45.]

8. TRADE-MARKS AND TRADE-NAMES ☞87—INJUNCTIVE RELIEF—ESTOPPEL.

Complainant's predecessor in business, whose name was "Regis," compounded about 1877 a medicine and adopted as a distinguishing name therefor the word "Rex." It was registered as a trade-mark in 1898 under the law of Massachusetts, and in 1900 it was registered in the Patent Office. Complainant's predecessor, prior to 1900, made no appreciable effort to extend her trade or mark beyond Massachusetts. She did not advertise in any journal, nor employ any outside solicitors. Defendant, ignorant of the trade-mark adopted for its medicine the word "Rex," and used it in his own trade for many years expending several thousand dollars in making its medicine known and establishing a business in Kentucky. *Held*, that complainant and predecessor were, because of estoppel, not entitled to injunction to restrain defendant from using in the future "Rex" in connection with its medicine.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 95; Dec. Dig. ☞87.]

Appeal from the District Court of the United States for the Western District of Kentucky; Walter Evans, Judge.

Suit by the United Drug Company against the Theodore Rectanus Company. From a decree for complainant (206 Fed. 570), defendant appeals. Reversed and remanded.

About 1877, Mrs. Regis, living in Haverhill, Mass., compounded a medicine which she considered useful for dyspepsia and some other disorders, and as a distinguishing name therefor she devised or adopted the word "Rex." She used this word in window signs, and marked it upon the boxes and packages put on the market, and it is not to be doubted that the word became her trade-mark. Under the name of "E. M. Regis & Co.," she continued the business, although in rather a small way. In 1898 she registered the word as a trade-mark under the laws of Massachusetts, and in 1900 procured registration in the United States Patent Office. In 1904 her exclusive right to the mark was adjudicated, by the Supreme Judicial Court of Massachusetts, in a suit which she had brought against the United Drug Company, a Massachusetts corporation, which was managing a chain of drug stores throughout the country known as the "Rexall Stores" and selling "Rexall" remedies. Regis v. Jaynes, 185 Mass. 458, 70 N. E. 480. She also established her priority in the mark as against the United Drug Company in a contested proceeding in the United States Patent Office. Thereupon the United Drug Company purchased and has since carried on her business, and purchased also in that connection the right to the trade-mark. In 1912 the United Drug Company filed in the court below its bill of complaint against the Rectanus Company of Louisville, and some of its officers, all citizens of Kentucky, alleging infringement of this trade-mark by the sale at Louisville of a medicine advertised and marked as the "Rex Blood Purifier." On final hearing, a decree was rendered for the United Drug Company, and the Rectanus Company appeals.

C. B. Blakey, of Louisville, Ky., for appellant.

L. A. Janney, of Boston, Mass., and Alexis C. Angell, of Detroit, Mich., for appellee.

Before KNAPPEN and DENISON, Circuit Judges, and SATER, District Judge.

DENISON, Circuit Judge (after stating the facts as above). 1. It is not denied that, in the Massachusetts litigation against Jaynes and

the United Drug Co., Mrs. Regis' claim to the trade-mark was earnestly contested and that every available defense was presented. The opinion of the Supreme Judicial Court of Massachusetts and the testimony in the present record alike impel us to the conclusion that her claim of prior right is thoroughly established, and that before 1880 she had so adopted and so used the word that her title thereto as a trade-mark—and with all the incidents of a common-law trade-mark —was perfected.

The difficulties in this case arise from the fact that Theodore Rectanus, the business predecessor of the defendant corporation, undoubtedly adopted and used the same word as a trade-mark upon a medicinal compound. He began this use about 1883, and it is safe to say that, as early as 1885, he had used the mark so considerably in Louisville that—save for Mrs. Regis' prior adoption—it clearly would have become his rightfully exclusive trade-mark. This adoption by Rectanus was in good faith, and its use was continued without intermission by him and his corporate successor, and without challenge of any kind from any one, from before 1885 until 1912—a period of at least 27 years. The real problem in this case is how these conflicting rights and their dependent equities shall be respectively treated.

2. The defendant contends that there is no infringement, because the Regis article has always been put up in pill or tablet form, and was originally, and until after the Rectanus rights had been initiated, labeled and advertised only as a dyspepsia cure, while the Rectanus article has always been put up in bottles and liquid form and called a blood purifier. To this contention the plaintiff replies that, both articles being intended to have medicinal effect through the stomach and digestive organs, with similar ultimate result, they are "of the same descriptive properties," and that, therefore, a trade-mark, valid for one, must extend to the other. In view of the result otherwise reached, it becomes unnecessary to pass upon these contentions, and for the purposes of this opinion we assume that such infringement exists as requires us to consider the further questions.

[1] 3. The validity of the trade-mark is attacked, because it is said that the article is useless or harmful, and that putting it on the market as a remedy is fraudulent. The proofs do not sustain this contention. It has as its basis an element which was once commonly prescribed for some digestive troubles, and which is still prescribed by some physicians. The expert witnesses agree that it may do some good along the line of its advertised benefits, and there seems to be no substantial reason to think that it will be injurious, unless it is taken in too great quantities. If the fact that an excessive amount is harmful were to condemn an article as fraudulent, many useful remedies would suffer.

[2] 4. The District Judge thus clearly stated the final difficulty:

"In our broadly extended country, the separate and independent use of these two trade-marks ran along contemporaneously in widely separated localities, without either of the parties most interested knowing what the other was doing, until comparatively a few months before this action was brought. The

judgment in this case, we think, must necessarily work a hardship upon one or the other of the parties, and possibly upon both."

The demand of the Drug Company for an injunction against Rec-tanus rests upon the proposition that a trade-mark right once ac-quired is exclusive, and extends at least throughout all places subject to the laws of the United States. This is a proposition often expressed in one form or another and formulated in the text-books. Hopkins on Trademarks, §§ 10, 13. District Judge Baker, in Church v. Russ (C. C.) 99 Fed. 276, 279, said:

"It is commonly said that there is a right of property in a technical trade-mark, and an infringement is spoken of as a violation of a property right. Whether this view, be correct or not is quite immaterial, because it is univer-sally agreed that some of the rights which are incident to property do inhere in a technical trade-mark."

In Lawrence v. Tennessee Co., 138 U. S. 537, page 548, 11 Sup. Ct. 396, page 401 (34 L. Ed. 997), the Supreme Court said:

"The jurisdiction to restrain the use of a trade-mark rests upon the ground of the plaintiff's property in it, and of the defendant's unlawful use thereof."

Based upon this theory of a property or equivalent right perfected by adoption, or by adoption and use, it may follow logically enough that a later appropriator is a trespasser, and should be suppressed, even though, at the time of the later appropriation, the prior claimant of the mark had not extended his trade into the defendant's territory. That there had been no actual conflict of trade, and so no present in-jury, is not of itself a sufficient answer to the claimant's demand, be-cause by defendant's conduct there is a threat or certainty of future injury to the naturally increasing trade and custom of the plaintiff. There can be no fixed standard of this normal expansion, and we are not called upon to declare any standard for other cases. It is clear that there may be instances where the plaintiff's delay to carry his trade into a particular territory has been so inconsistent with the ordi-nary conduct of business as to amount practically to an abandonment or disclaimer of that territory; and if in such case it has come about that with the express or implied knowledge of plaintiff another has occupied the territory in ignorance of any claim of prior right, and so has been misled into a large expenditure in building up a business, we have not merely that laches which make a court hesitate to enforce the prior right, but that estoppel which forbids such enforcement. Even at law, the statutes of adverse possession recognize that plaintiff, with good title to an estate, may lose the right to recover that part of it which he permits an adverse claimant to occupy for too long a time; and there are many familiar instances where courts of equity are moved by the principles of laches or of estoppel to deny specific relief to one whose general or original title is broadly good.

[3] We must classify this case as one of those to which we have just referred. Conceding to Mrs. Regis and her successor the broad or the prima facie original exclusive right to the mark, and conceding, without deciding, that no particular standard of diligence should be enforced against them in the matter of expanding their trade over the country, we find much more than lack of diligence; we find com-

plete indifference. If we take the year 1900 for comparison, we see that, for more than 15 years, Rectanus had been using the mark in his own trade, had expended probably several thousand dollars in making the mark well known, and had established a considerable, although local, business in Louisville and vicinity. His excursions outside of that local field are too inconsiderable to have importance. Although an active druggist, familiar with the literature of the trade, he had never heard of Mrs. Regis' remedy or of her trade-mark. On the other hand, during more than 20 years after the adoption of the mark, Regis & Co. had then done nothing whatever to make it known outside of the New England states, save sporadic sales in territory practically adjacent to those states. So far as Kentucky was concerned, they sent no salesmen there and did no advertising whatever intended to reach that territory. They had registered the mark in Massachusetts, thus getting the local effect of the state statute; but not until 1900 did they indicate by registration in the Patent Office that they claimed an interstate trade-mark. Speaking practically, they confined to one corner of the country their trade and their efforts to get trade. This might not be important, if it had characterized their conduct for 1 or 2 years, or some other short period, or if it could be said that they were merely awaiting a natural development. Such absolute disregard of the Kentucky territory for 20 years indicates rather more than indifference, and they were bound to know that others were likely to act upon the assumption that the field was open and that their silence would mislead any one who did act in reliance on that assumption.

The compelling equity in the position of defendants, situated as Rectanus is, has in several instances led courts of equity to refuse an injunction in aid of the first adopter of the mark; and sometimes in so doing they have seemed in some degree to reject the general principle that the right is exclusive and belongs to the one who first adopts and uses. We are not called upon to decide how far the force and effect of this principle usually go; each case beyond its reach, whether by negation or by exception, depends upon particular facts; and each one of the decided cases which has been brought to our attention can be reconciled with, and perhaps should be considered as standing upon, the theory which we have stated, viz., that, even if we concede to the first appropriator of the mark the prima facie right exclusive against all others and everywhere, courts of equity will not enforce it where the rules of laches or estoppel make such enforcement unjust, and that in such case the original owner does not lose his general right, but only the power of enforcing it, in a particular territory, against a specified person and to the extent that plaintiff has acquiesced.

Some of the language of the opinion of the District Court in Carroll v. McIlvaine (the "Baltimore Club" Case) 171 Fed. 125, seems to indicate that the trade-mark right may not go beyond the extent to which plaintiff has actually taken possession of the trade; but when the case came to the Circuit Court of Appeals of the Second Circuit (183 Fed. 22, 105 C. C. A. 314) it was distinctly held that Carroll, by prior adoption, had acquired the better right to the trade-

mark, and the refusal to enforce it against McIlvaine in the territory occupied by him was put solely upon the ground of laches which amounted to an estoppel. In Macmahan Co. v. Denver Co. (C. C. A. 8) 113 Fed. 468, 51 C. C. A. 302, it appeared that while the word involved, "Antiphlogistine," might be capable of appropriation as a trade-mark, the plaintiff's use of the word had been so trifling in amount and so exclusively confined to single and small classes of customers that there had not been a sufficient appropriation to create in the plaintiff the normal, full, and exclusive trade-mark right in the word as applied in a broader field. The substantial decision was that, in fact and in law, plaintiff never acquired the trade-mark right. The case, on its facts, was an obvious effort by a former officer of defendant to destroy what he had sold, and the result reached was plainly the right one. In Hanover Co. v. Allen Co. (C. C. A. 7) 208 Fed. 513, 125 C. C. A. 515, it appeared that plaintiff adopted "Tea Rose" as a trade-mark for flour in 1872. It had sold its flour only in states north of the Ohio river, and in the Southeastern states it had, apparently, up to the time of commencing suit, been selling its flour only under other trade-names. The defendant had adopted the same name, in 1893, without knowledge of plaintiff's prior use, and from 1894 until suit commenced, probably 1912, it had been pushing its trade under that name in the Southeastern states, and built up a large business, so that, in the flour trade in that territory, the mark had come to mean defendant's flour and nothing else. An injunction was refused as against this particular Southeastern trade. The opinion rests, to some extent, upon the idea that a trade-mark is wholly and merely pertinent to an existing trade, that it cannot be enforced beyond the field which is already occupied by that trade, and that, outside of that field, a later comer may acquire rights in the same trade-mark; but it is not necessary so to interpret the opinion. Plaintiff, while using the trade-mark for 40 years, had kept it out of the Southeastern territory, and it would be difficult to distinguish such indifference from a positive abandonment; the defendant, without objection and to an extent which would have brought notice to plaintiff, if plaintiff had been claiming rights there, had been for 18 years using the mark in promoting its business in that territory; even when suit was commenced, plaintiff had no trade which was or could be injured by defendant's act; in that territory it had only expectation or possibility that it might some time acquire such trade: and, on these facts, it might well be said that plaintiff was not entitled to aid from a court of equity.[1]

Our conclusion is that, on the facts of this case, plaintiff was not entitled to the injunction sought. We decide nothing further. Whether Rectanus has any affirmative right whatever, as distinguished from the merely defensive one which we have considered, and whether that defensive right extends to the use of the mark upon any article, excepting where, as in the case of the blood purifier, that use had continued so long without challenge as to raise an estoppel—these

---

[1] Upon the subjects of laches and estoppel, see, further, Saxlehner v. Eisner Co., 179 U. S. 19, 21 Sup. Ct. 7, 45 L. Ed. 60.

questions are not involved. We now hold only, as the Court of Appeals in the Second Circuit did in the Baltimore Club Case, and as we think the Court of Appeals in the Eighth Circuit did in Kahn v. Gaines, 161 Fed. 495, 88 C. C. A. 437 (see our discussion of this case in Gaines v. Rock Spring Co., 226 Fed. 531, —— C. C. A. ——, this day decided), that the defendants may continue to do the thing at which the suit was directed—in this instance, use the word "Rex" upon and in connection with their blood purifier.

It follows that the bill of complaint must be dismissed, and for that purpose the decree is reversed, and the case is remanded, with the costs of this court to appellant.

## On Petition for Rehearing.

The petition for rehearing urges us to reconsider the conclusion that plaintiff's valid trade-mark is not entitled to full protection by injunction against Rectanus. It is said that our opinion is without precedent, in that it finds that plaintiff owns a valid trade-mark and has moved promptly after having actual knowledge of the infringement and yet refuses relief; in other words, and using the nomenclature of the petition, it is said that an injunction in a trade-mark case has never been denied on the ground of "estoppel by negligence," * and the petitioner's counsel think that the adoption of such principle is in serious conflict with established trade-mark law and will lead to very unfortunate practical results.

We did not originally fail to appreciate that our conclusion was without specific precedent, and we then gave what consideration we could to the matter of practical results; but we were without the aid now given by the thorough presentation found in the petition. The arguments now presented and the novelty of the question justify some further discussion.

[4] It is settled that injunction against future trade-mark infringement may not be denied because of the mere laches of plaintiff (see cases infra); and it must be conceded that the record here discloses no actual knowledge by Mrs. Regis or her successors of the fact that Rectanus was using the mark until they acquired such knowledge shortly before suit brought. Since, in order to raise an estoppel in pais, it is essential that one party shall do some act, or neglect some act, and that the other party, in reliance on such doing or neglecting, shall change his position so as to import prejudice if the first act or neglect is repudiated, it follows that our conclusion of estoppel cannot be maintained unless it shall be assumed that Mrs. Regis was guilty of some neglect toward the public or toward the class of which Rectanus was a member, and that Rectanus, because of that neglect, has changed his position.

[5] It is true there can be no neglect, unless there is a duty; but these are relative terms. There can be no absolute duty resting on one

* By this phrase meaning that estoppel which at last rests, not upon a trade-mark owner's actual knowledge of the use by the person afterwards made defendant, but rather upon a knowledge imputed to the owner because of his indifference and neglect.

who adopts a trade-mark to bring it at once to the attention of everybody. Such duty as there may be in this direction must rest upon the obligation of the one adopting to realize that, in the absence of a widespread knowledge of the existence of his claim to the mark, others will be likely to adopt it and spend their money in its promotion in their own interest. This obligation must be as variant in degree as are the circumstances of each case from those of another case; but we cannot doubt that, under present-day conditions, there are cases in which some measure of such obligation does exist. Formerly, the number of competing traders in a given line—and, hence, the probability that another would hit upon the same trade-mark—was slight as compared to that number and that probability now; and formerly the means by which a trade-mark owner could spread general knowledge of his claim were comparatively ineffective, and the trade customs which now make it so much a matter of course for trade-marks to be put before the public the country over, were largely nonexistent. Mrs. Regis and her successors used as a trade-mark a word which, though not descriptive in the forbidden degree, was yet so far suggestive of quality that its adoption by others was as likely as its choice by her had been natural. From 1883 (when Rectanus' use began), until now, it has been true that a small expense in trade journal advertising enables the trade-mark proprietor to put his article and its name before the entire trade; and the custom of so doing has been well-nigh universal. As business methods and business customs change, so change the fact standards of reasonable prudence and care in guarding business rights.

[6] Mrs. Regis, at least prior to 1900, made no appreciable effort to extend her trade or her mark beyond Massachusetts; the instances of sales beyond that field are almost negligible.[2] She advertised in no journal. She employed no outside solicitors. Knowledge of the remedy and its name did not spread, save as one user told another, and save as she and one or two others canvassed from house to house in a few Massachusetts towns. Until 1898 she did no act adapted to give any general notice of her claim; and the act then done—the state registration—was, of course, confined in its effect to that state (chapter 72, Rev. Laws Mass.). In 1900 she registered in the Patent Office, and then, for the first time, clearly disclosed her claims to a country-wide trade-mark.

[7] Registration under the federal Trade-Mark Act is not expressly made notice of the rights claimed, and so it cannot, as matter of law, be called a constructive notice; and yet that it in fact tends to give notice is well known. The substance of the registration is published in an official journal. This published list is regularly scrutinized by many manufacturers and dealers; and it is common practice for any one proposing to adopt a trade-mark to have a search made in the classified lists of registrations in order to determine whether the pro-

[2] Mrs. Regis sent a few boxes into Maine, New Hampshire, Vermont, and New York. She sold a few which the buyers were to send to Canada or Virginia. No one of these is fixed as before 1900; all may as well have been, as the business reached its largest volume shortly before she sold out in 1910.

posed mark has been already appropriated. The application for registration itself shows that a use which may have been indefinite or fugitive has grown and developed into a definite claim of right, covering interstate and foreign commerce. It may well be that either a federal registration or some suitable advertising would, in a particular case, be notice enough to the public of which the defendant was a member, so that every obligation of fairness resting on the claimant would be satisfied, and so the defendant would have no basis to say that he had been both innocent and diligent while the claimant had been careless and indifferent in creating the situation tending to make an estoppel. These questions are not presented; nor is it necessary to say that at any particular time Mrs. Regis became charged with any particular degree of duty to make her claim generally known.

[8] It is enough to say that in (e. g.,) 1895, at the end of more than 15 years of this policy of doing nothing in any of the customary methods to give either the trade or the general public knowledge of the claimed trade-mark, Mrs. Regis was bound to know that others would be likely to adopt or to be using the same word in ignorance of her appropriation, and to be making investments therein. If she was bound to know this, it must be conclusively presumed that she did know it; Rectanus' continued investment from 1895 to 1900 in exploiting what he thought was his trade-mark, makes a satisfactory case of estoppel; and 10 or 12 years more of indifference to other than comparatively local trade, after the 1900 notice, accompanied by defendant's continued expenditure, does not weaken the defense. It is, perhaps, not accurate to say that she is conclusively presumed to know what she was bound to know, but the distinction is here immaterial. One is bound to know the law, and so is bound to anticipate the results which, by law, must follow from his acts; and it would seem that others who rely upon the knowledge and intent so presumed could claim the protection of an estoppel just as much as if the knowledge and intent had been actual.

We cannot join in counsel's apprehension that from this principle serious harm will come to trade-mark owners. We carefully refrained, in this opinion and the accompanying opinion in Gaines v. Rock Spring Co., 226 Fed. 531, —— C. C. A. ——, from deciding what degree of diligence, if any, by the trade-mark owner in exploiting his claims, was necessary to protect him from losing, in this way, a fraction of his trade-mark right. Only in an extreme case would a court reach the conclusion which we here reached. The trade-mark owner, prosecuting and exploiting his business in the ordinary way, can have nothing to fear from the rule of the opinion. Not only will the cases, where this situation arises, be rare, but only in a fraction of those cases will there be practical difficulty in determining the conflicting rights of the general owner and the one who must be left in the possession of what he has taken. Such difficulties as may develop we must think to be a lesser evil than it would be to permit plaintiff, by asserting a prior right, to destroy that which had been built up in the reasonable belief, induced by plaintiff's conduct, that no such prior right existed. Of course, it is not necessary to the theory of

estopped that the one claiming it should have acted upon an affirmative misrepresentation. It is enough if he has acted as he would not have done if he had known the truth, and if the one against whom the estoppel is claimed kept silent when he should have spoken.

So much by way of reference to the principles, the proper application of which must control this case. We turn now to the decided cases, and the discussion of them in the petition. Those cited in our opinion, so far as petitioner's counsel think they give color of support to the conclusions of the opinion, are sought to be distinguished on one or the other of two grounds. It is said that the finding of an estoppel, where that result has been allowed to defeat a valid trade-mark (as in the Baltimore Club Case, 183 Fed. 22, 105 C. C. A. 314, in the Circuit Court of Appeals) has been based on actual knowledge by plaintiff that defendant was using the mark and on plaintiff's acquiescence after such knowledge. In the case just cited, this is true; but it is difficult to distinguish between the effect of knowledge proved in fact and knowledge imputed by law. A doubtful inference is not so satisfactory as clear and direct proof; but, when once the inference is drawn, the fact is established. We must doubt whether the result in the Baltimore Club Case would have been different if it had appeared only that plaintiff had done nothing for 20 years toward extending his trade-mark beyond Baltimore; that plaintiff had been indifferent as to what was done in New York; that any ordinarily vigorous pushing of plaintiff's business, at any time for twenty years, would have disclosed defendant's use; and that the mark consisted of such a quasi descriptive or suggestive word as to be rather likely to be selected by others. We think that case differs from the present, not in principle but in degree.

Nor can we think that the presence of actual competition between the parties at the time suit is commenced is the sole criterion by which cases are to be distinguished, as the petition urges with reference to Hanover Co. v. Allen Co., 208 Fed. 513, 125 C. C. A. 515, supra. Whether the ground of the defense be laches or estoppel, if the defense is good to-day, it does not seem that it can be bad next week, merely because in the meantime plaintiff first brings in and offers for sale his goods in the local territory where defendant is established. If so, then neither defense could ever avail, because plaintiff could always delay bringing suit for a few months or a year and until after he had come in and was selling some goods in defendant's territory —which is practically what happened in this case.

The insistence of the petition that our opinion runs counter to settled principles is based chiefly on McLean v. Fleming, 96 U. S. 245, 24 L. Ed. 828; and Menendez v. Holt, 128 U. S. 514, 9 Sup. Ct. 143, 32 L. Ed. 526. In the former case, plaintiff's acquiescence and delay were held sufficient to bar an accounting, but not to prevent an injunction; but it clearly enough appeared that defendant's actions had not been innocent. He had been fully aware of plaintiff's right to the marks and labels, and he had copied them as closely as he dared. His contention was that he had not infringed; but he had always known that if he was wrong in this contention his conduct

was unlawful. The element of good-faith expenditure by defendant in building up a business on a mark which he had a right to suppose was his, is wholly lacking in McLean v. Fleming. Without that basis, there could be no estoppel; and so the case has no bearing upon the latter question. In Menendez v. Holt, there was the same situation. Defendants were using the mark under Ryder, who had formerly been in partnership with plaintiff in the business to which the mark was incidental, and it is clear that defendants made no claim that they had been ignorant of plaintiff's rights. They had taken their chances on the validity of the trade-mark and the sufficiency of plaintiff's title. Surely there could be no estoppel; and so the court expressly says. 128 U. S. on page 524, 9 Sup. Ct. 143, 32 L. Ed. 526. The plaintiffs had always been diligent in giving notice, and the defendants had never been innocent.

Reliance is had, also, on the two Hunyadi-Janos Cases in 179 U. S.—the Eisner Case, 179 U. S. at pages 19, 39, 21 Sup. Ct. 7, 45 L. Ed. 60, and the Siegel-Cooper Case, 179 U. S. at page 42, 21 Sup. Ct. 16, 45 L. Ed. 77. In the Eisner Case, the conclusion reached seems to have depended on the theory of unfair competition, and not on that of trade-mark infringement. The title to the word "Hunyadi," as a trade-mark, was held to have been lost; but the characteristic red and blue label was protected against fraudulent simulation. Not only was the original ground of relief found to lie in defendant's fraud, but perhaps for the same reason only the defense of laches was overruled. In the Siegel-Cooper Case, it appeared that defendant was merely a retailer under purchases made from the Eisner Company, and that the Eisner Company was the actual defendant. Perhaps it was inevitable that the case should have the same result as the Eisner Case; and yet it is not quite clear why, in the latter case, relief should have been denied on the ground of trade-mark infringement and given on the ground of fraud, and in the Siegel-Cooper Case the absence of any fraudulent intention by defendant should have been held immaterial, and on the authority of strict trade-mark cases; but, whatever may be the proper view of the Eisner and Siegel-Cooper Cases, they do not militate against the defense of "estoppel by negligence" in a proper case. Not only did neither defendant claim an estoppel, but the Eisner Company could not have done so because estoppel cannot be based on fraud, and the Siegel-Cooper Company could not have done so because it had made no expenditures based upon its belief in its own title to the subject-matter, nor was it ignorant of plaintiff's claim.

We are cited, also, to several decisions in patent cases (of which Taylor v. Sawyer Co. [C. C. A. 3] 75 Fed. 301, 22 C. C. A. 203, and Ide v. Trorlicht [C. C. A. 8] 115 Fed. 137, 53 C. C. A. 341, are typical) to the effect that an injunction against the continuation of a patent infringement will not be denied because of equities which have arisen in defendant's favor through plaintiff's indifference or delay. These cases usually themselves save the question of a possible estoppel; but suits upon a patent and a trade-mark present, in this respect, a very imperfect analogy. A patent is an absolute monopoly; the patentee is under no obligation to work the patent; he has received a

grant of a right to exclude all others unconditionally and entirely; and all others have constructive notice of his rights. With reference to a trade-mark, the monopoly is only incidental to an existing business; unless the business is prosecuted, the right is lost; there is (at least lacking registration) no constructive notice to others; others have a right to appropriate the mark to themselves, if plaintiff stops using it. Obviously there is in trade-mark cases much more room than in patent cases for a defendant to acquire, on the theory of estoppel, a right which a court of equity will protect.

A study of these cases, as well as of the others presented, has not convinced us that our conclusion was mistaken, and the petition for rehearing is denied.

It should be understood, as was more fully stated in the "Old Crow" Case, that such an adjudication as is here directed is confined in its effect to the territory which the Rectanus Company had reached and was occupying to a substantial extent when it received notice of plaintiff's claims. How far, if at all, it may promote an increase or accept a natural increase constitutes one of the "difficulties which may develop" from conflicting rights, as specified in a previous paragraph, and which we do not undertake to consider.