**GEMEX CO. v. J & K SALES CO., Inc.**
**Civil Action No. 667.**

District Court, D. Rhode Island.

May 15, 1947.

Marshall Swan, of Providence, R. I. (Blair, Curtis & Hayward, of New York City, of counsel), for plaintiff.

Nathaniel Frucht, of Providence, R.I., for defendant.

HARTIGAN, District Judge.

This is a civil action for trade-mark infringement and unfair competition based on plaintiff's common law rights in the trade-marks "Baron" and "Baroness" as applied to watch bands or bracelets.

The plaintiff is a New Jersey corporation having its principal office and place of business at Union, New Jersey, and for a long period of time has been engaged in the designing, manufacturing and marketing of 'articles of jewelry including bands for men's and women's wrist watches.

The defendant is a Rhode Island corporation having a place of business in the City of Pawtucket. It was incorporated January 29, 1946, and for some time prior thereto did business under a similar name 'as a partnership. It finishes stainless steel and gold plated watch bands and distributes them to wholesalers and jobbers.

The sole question here is the priority of use in said trade-marks.

November 2, 1943, the plaintiff adopted the trade-marks "Baron" for men's bracelets and "Baroness" for women's bracelets. The men's bracelets prior to this time were sold under the name "Captain."

November 14, 1945, the plaintiff wrote to its attorneys: "We have decided to use the trade-marks the 'Baron' and the 'Baroness' as names for two models of our bands * * *."

November 15, 1945, the plaintiff wrote to its advertising agency: "Confirming our conversation with Mr. Zee, we have decided to take a chance on the names 'The Baron' and 'The Baroness.' " The same day it issued a written order to cease stamping bracelets with the old trade-mark "Captain" and issued a new instruction: "Stamp the Captain Gemex Co. and Quality lengthwise right next to U.S.A. stamp" and the men's bracelets from then until about January 12, 1946, were stamped with the Gemex mark until the plaintiff received its "Baron" stamp.

November 29, 1945, plaintiff issued a purchase order to a stamp and die works which stated: "Make 1 stamp as per our conversation. The Baron Gemex Co. See sample for size."

December 13, 1945, plaintiff planned production for 1,000 men's bracelets.

December 14, 1945, the plaintiff ordered tags reading "The Baron by Gemex" and "The Baroness by Gemex" which were to be attached to boxes in which the bracelets were to be sold. January 25, 1946, these tags were delivered to the plaintiff.

December 17, 1945, the plaintiff notified its salesmen of its decision to do national advertising during the course of 1946 and in a letter stated: "* * * we are going to concentrate our advertising on the old gold Captain bracelets for men and women. Instead of 'Captain' it will be called the 'Baron' and the 'Baroness.'"

December 27, 1945, the plaintiff ordered a "Baroness" stamp from the same company that it ordered the "Baron" stamp.

January 12, 1946, the "Baron" die was delivered to the plaintiff and payment for it was made by the plaintiff on January 31, 1946.

January 17, 1946, the plaintiff sold and shipped to Taylor & Co., Houston, Texas, six bracelets stamped with the trade-mark "Baron".

Andrew J. Fogarty, Assistant Secretary and Assistant Treasurer of the Gemex Company, testified as follows:

"235 Q. After the BARON stamp was received on January 12th, did you give any particular instructions as to the marks which should appear on V-73 (Baron) bracelets which were to be shipped from thence forward by your company? A. I gave very definite instructions to the shipping department that once we had bracelets with the BARON trade-mark, we were to suspend shipment of any bracelets that were stamped CAPTAIN or just with the GEMEX mark.

"236 Q. Why did you do that? Why did you give those instructions? A. Because our national advertising campaign was then in progress. We expected the ads to be released next month and we wanted every bracelet that we shipped to be identified to tie in with the national advertising.

"237. Q. Then your instructions were that if there were bracelets stamped BARON, that they should be shipped out. Is that correct? A. That is correct.

"238 Q. And if there were BARON bracelets in existence; that is, bracelets with BARON stamped on them, would they have been shipped out to fill this order on January 17th? A. They definitely would."

January 18, 1946, the defendant ordered 3,000 watch bracelet cards in two colors marked "Baron by Garreau" and 5,000 cellophane envelopes. These were billed on January 28, 1946, to the defendant and the office clerk for the printer testified that the above order was shipped on January 28, 1946.

January 21, 1946, plaintiff sold and shipped one "Baron" bracelet to Taylor & Company.

The plaintiff on January 21 and 22, 1946, held meetings with its salesmen and discussed its plans for merchandising the "Baron" and "Baroness" bracelets.

January 28, 1946, the plaintiff wrote a letter to its representative in San Francisco in which it stated:

"At our sales meeting last week we discussed our plans for National Advertising as well as for the merchandising of the Baron and Baroness bracelets. * * *

"National Advertising: Full page ads in color will appear in the March, May, August, October and December issues of Glamour and also in the April, July, September, November and January, 1947 issues of Esquire. Advertisements tying in with the national advertising will appear in the trade papers throughout the year and will include in various months, two and four page inserts of the national advertising.

 *  *  *  *  *  *

"Mr. Frizzell has had the gold line out in New York City for two days, which is a notably hard market for the sale of high priced merchandise. In these two days he sold to the wholesalers a total of $12,-500 in gold bracelets, over half of which

is represented by sales of the Baron and Baroness bracelets. * * * "

January 24, 1946, the plaintiff sold and shipped two "Baron" bracelets to W. C. Snodgrass, Houston, Texas, and one to S. Kamerow, New York City.

January 24, 1946, The Foxon Company of Providence, R. I. shipped 2,000 "Baron" tags and 2,000 "Baroness" tags to the plaintiff and on February 24, 1946, shipped 19,000 "Baron" tags and 19,000 "Baroness" tags, the order for these tags having been received by The Foxon Company on December 21, 1945, from the plaintiff.

The Tasca Jewelry Co. of Providence, R. I., on January 25, 1946, ordered 100 bracelets from the defendant which were delivered January 26, 1946, and gave its check to the defendant in the sum of $125 in payment.

The testimony of Carlo A. Tasca is not convincing that these 100 bracelets were tagged with the "Baron" card of the defendant.

Henry S. Jablecki, Secretary and Treasurer of the defendant company, testified that he received the defendant's "Baron" cards on January 25, 1946. His testimony is in conflict with the testimony of the office clerk of Samuel P. Harris, Inc., which printed the defendant's cards and who testified that January 28, 1946 was the shipping date and the billing date of the defendant's cards.

January 26, 1946, the plaintiff sold and shipped a "Baron" bracelet to Zale Jewelry Company, New York City, and one to Adolph Braude Corporation, Chicago, Illinois, and these two bracelets were marked with the trade-mark "Baron" and had "Baron" tags on them.

January 28, 1946, the plaintiff shipped a "Baroness" bracelet to Eisenstadt Manufacturing Company, St. Louis, Missouri, on memorandum bill. This bracelet was in a box which had a "Baroness" tag.

February 12, 1946, the Eisenstadt Manufacturing Company wrote to the plaintiff: " * * * We treated this memo (of January 28) as a regular invoice and ask that you kindly do likewise."

In February, 1946, the plaintiff mailed to wholesalers throughout the country circular letters offering the "Baron" and "Baroness" bracelets. February 23, 1946, plaintiff had completely assembled and ready for finishing or polishing 990 "Baroness" bracelets which were stamped with the trade-mark "Baroness."

March 7, 1946, plaintiff sold and shipped one "Baroness" bracelet to Earl Sculler Co., Columbus, Ohio.

The plaintiff's first national advertising of "Baron" and "Baroness" bracelets appeared in the March, 1946 issue of Glamour magazine and its second national advertising appeared in the April, 1946 issue of Esquire, both of these being full page colored advertisements.

April 17, 1946, the defendant ordered "Baroness" watch bracelet cards and these were billed to the defendant by the printer on April 23, 1946.

April 26, 1946, the defendant sold thirty-eight dozen "Baroness" gold plated watch bracelets to Harkins & Murphy Co., Boston, Mass. This was the first sale by the defendant of "Baroness" bracelets.

During the year 1946 the plaintiff continued its national advertising and expended between $45,000 and $50,000 on its "Baron" and "Baroness" trade-marks. Its sales of "Baron" and "Baroness" bracelets in 1946 amounted to approximately $300,000.

The defendant in 1946 sold a large number of its "Baron" and "Baroness" bracelets. It also did considerable advertising of its products in a newspaper and by the use of display cards and the mailing of circulars to hundreds of wholesalers and jobbers throughout the country.

I find that as between the plaintiff and the defendant that the plaintiff was the first to use and employ the trade-marks "Baron" and "Baroness" on watch bracelets.

I find that the use of the trade-marks "Baron" and "Baroness" by the plaintiff commenced on January 17, 1946 and February 12, 1946, respectively, and their use by the plaintiff has been continuous and substantial to the date of the filing of the complaint.

I find that the defendant did not use the trade-mark "Baron" before January

25, 1946, and the trade-mark "Baroness" before April 26, 1946.

The oral testimony and documentary evidence convince me that the plaintiff has established the right to use the trade-marks "Baron" and "Baroness" as against the defendant.

I find that the defendant has infringed the trade-marks "Baron" and "Baroness" and the plaintiff is entitled to an injunction restraining the defendant from applying, displaying, advertising, or otherwise using as trade-marks in connection with bands or bracelets for men's and women's wrist watches the words "Baron" and "Baroness."

In Columbia Mill Company v. Alcorn, 150 U.S. 460, 463, 464, 14 S.Ct. 151, 152, 37 L.Ed. 1144, the court said:

"* * * the exclusive right to the use of the mark or device claimed as a trademark is founded on priority of appropriation that is to say, the claimant of the trade-mark must have been the first to use or employ the same on like articles of production. * * *"

The plaintiff's use of the trade-mark "Baron" commenced at least eight days prior to the use of the same mark by the defendant.

In Walter Baker & Co. v. Delapenha, C.C., 160 F. 746, 748, 749, the court said: "Nor does the fact that the complainant adopted and used its trade-marks but a short time before the defendants imported and sold goods bearing like trade-marks, alter the the situation. The complainant's rights accrued as soon as it had put goods upon the market bearing its trade-marks. Priority of use rather than priority of invention confers the right. The right to use does not depend upon any particular period of user; once a trade-mark is adopted in good faith and used, the right thereto inures and will prevail against any subsequent user. * * *"

In Weldes v. International Mfrs.' Agency, D.C., 237 F. 502, 505, the court said: "* * * Yet it is the priority of user alone that controls, even though when the defendant comes into the field, it may not be fully established, or may not even be enough established to have become associated largely in the public mind with the plaintiff's make. Kathreiner's Malzkeffee Fab., etc. v. Pastor Kneipp Medical Co., [7 Cir.], 82 F. 321, 27 C.C.A. 351; Thomas J. Carroll & Son Co. v. McIlvaine & Baldwin, [2 Cir.], 183 F. 22, 105 C.C.A. 314; Walter Baker v. Delapenha, C.C., 160 F. 746. Were it not so, it would be of extreme difficulty to show at just what point in time the mark became associated with the maker in enough of his customers' minds to justify the inference that the defendant's use might have become confusing. Therefore, once his use begins, the rest of the public must avoid his fanciful mark."

The plaintiff in its brief states: "* * * so far as appears, defendant was honest in its independent adoption of the same marks, having no knowledge of plaintiff's similar activities." In view of this statement and the evidence, no costs or damages will be allowed to the plaintiff.

Judgment may be entered in accordance with this opinion.