W. A. GAINES & CO. v. ROCK SPRING DISTILLING CO. et al. *

(Circuit Court of Appeals, Sixth Circuit.   July 20, 1915.   On Petition for Rehearing, November 2, 1915.)

No. 2572.

1. TRADE-MARKS AND TRADE-NAMES ☞45—REGISTRATION OF TRADE-MARKS—STATUTORY PROVISIONS.

The rights acquired by the use of descriptive words as a trade-mark for more than 10 years before 1905 are perfected by registration under Act Feb. 20, 1905, c. 592, 33 Stat. 724 (Comp. St. 1913, §§ 9485–9516), authorizing registration of trade-marks.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. §§ 53, 59; Dec. Dig. ☞45.]

2. TRADE-MARKS AND TRADE-NAMES ☞3—ACQUISITION OF TRADE-MARK—REGISTRATION—PROPER NAMES.

A practical distiller named Crow was employed at a distillery, and the whisky there produced was called "Crow," or "Old Crow." At his death in 1855 a considerable quantity of his whisky was in existence, and during succeeding years it continued to have a market reputation, and represented a high standard under one or the other of these names. At the same distillery and with the same formula whisky was made after his death, and the product was continued to be called "Crow" or "Old Crow," and this continued for many years prior to the act of 1905, authorizing the registration of trade-marks. The words "Old Crow" were registered as a trade-mark in 1882, in 1904, and in 1909 under the act of 1905.   Held, that the trade-mark registered under the act of 1905 was valid, at least as against a person, not named Crow.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. §§ 4–7; Dec. Dig. ☞3.]

3. TRADE-MARKS AND TRADE-NAMES ☞96—INFRINGEMENT—FORMER DECISION—RES JUDICATA—PERSON WHO MAY ASSERT BAR.

Where a corporation leased a distillery, and later contracted with the owner, after termination of the lease, for the bottling of the product of the distillery under a brand used by the corporation, which was claimed to infringe complainant's trade-mark, giving an indemnity bond to secure the owner and its subsequent lessee against complainant's claims, the owner and its lessee were entitled to avail themselves of the judgment in favor of the corporation in a prior suit by complainant over the right to use the trade-mark, as against the objection of want of privity.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 109; Dec. Dig. ☞96.]

4. TRADE-MARKS AND TRADE-NAMES ☞31—APPLICABILITY OF TRADE-MARK.

Under the common-law rule that a trade-mark for one article extends to an article of the same descriptive properties, and under the statute for the registration of trade marks, a trade-mark on whisky applies to straight and blended whiskies.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 35; Dec. Dig. ☞31.]

_____

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

*Writ of certiorari granted December 20, 1915.

**5. TRADE-MARKS AND TRADE-NAMES ☞86—APPROPRIATOR OF TRADE-MARK —EXCLUSIVENESS OF RIGHT—ESTOPPEL.**

If the first appropriator of a trade-mark has prima facie the exclusive right to use the trade-mark on his product throughout the country, he may by estoppel lose the right to injunctive relief against a later user thereof.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 95; Dec. Dig. ☞86.]

**6. TRADE-MARKS AND TRADE-NAMES ☞84—REGISTRATION—EFFECT.**

Registration of a trade-mark under the act of 1905, authorizing the registration of trade-marks, makes a prima facie case of title, but does not impair any substantive defense available to one if there had been no registration, except in so far as it may affect the character of the registrant's title to a descriptive word in a secondary meaning.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. §§ 93, 97; Dec. Dig. ☞84.]

**7. TRADE-MARKS AND TRADE-NAMES ☞43—REGISTRATION—EFFECT.**

Where one had only a defensive right to use a word as a trade-mark sufficient to protect him against injunctive relief by another, the latter could register the trade-mark under the act of 1905.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. §§ 48, 49; Dec. Dig. ☞43.]

**8. TRADE-MARKS AND TRADE-NAMES ☞44—REGISTRATION OF TRADE-MARKS— FRAUDULENT REGISTRATION—ACTS CONSTITUTING.**

A registration under the act of 1905 of the words "Old Crow" as a trade-mark for whisky was not obtained fraudulently merely because the application stated that the trade-mark had been continuously in use by the applicant and its predecessors since 1835, and that no other person had the right to use the mark, on proof that the name had long been used in 1855, though the use was of a character analogous to a descriptive use, rather than a strictly trade-mark use, for a period which did not expire until an indefinite date, perhaps 1870.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. §§ 50–52; Dec. Dig. ☞44.]

**9. TRADE-MARKS AND TRADE-NAMES ☞43—REGISTRATION OF TRADE-MARKS —FRAUDULENT REGISTRATION—ACTS CONSTITUTING.**

A registration under the act of 1905 of the words "Old Crow" as a trade-mark for straight whisky is not fraudulent merely because the application therefor states that no other person has the right to use the trade-mark, while one has the defensive right to use the words as a trade-mark on blended whisky, for an applicant for registration of a trade-mark may confine his registration and its effect to such classes or subclasses of an article of the same descriptive properties as he may select and it does not concern the person having the right to use the words on blended whisky if the registration did not include blended whisky as well as straight whisky.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. §§ 48, 49; Dec. Dig. ☞43.]

**10. TRADE-MARKS AND TRADE-NAMES ☞44—REGISTRATION OF TRADE-MARKS —FRAUD.**

A registration under the act of 1905 of the words "Old Crow" as a trade-mark for straight whisky was not obtained fraudulently because the applicant did not summon one entitled to use the words on blended whisky, though the statute contemplates that adverse claimants, when known, shall have notice and an opportunity to oppose.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. §§ 50–52; Dec. Dig. ☞44.]

11. TRADE-MARKS AND TRADE-NAMES ⊙═97—INFRINGEMENT OF TRADE-MARKS —EQUITABLE RELIEF.

Where complainant had a valid registered trade-mark, "Old Crow," in connection with straight whisky, it was entitled to restrain another from using the names "Crow" or "Old Crow" in connection with straight whisky not made by complainant; and the court, having jurisdiction only by reason of the registration of the trade-mark, could not grant complainant further relief, in view of a prior decree adjudging that defendants had the defensive right to use the words on blended whisky.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. §§ 110, 111; Dec. Dig. ⊙═97.]

### On Petition for Rehearing.

12. TRADE-MARKS AND TRADE-NAMES ⊙═93—INFRINGEMENT—PRESUMPTIONS— EVIDENCE.

In a suit for infringing a trade-mark, there is no initial presumption of validity to be overcome, and the testimony of unaided recollections of a witness of dates 40 years old cannot be accepted.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. §§ 104-106; Dec. Dig. ⊙═93.]

13. TRADE-MARKS AND TRADE-NAMES ⊙═100—INFRINGEMENT—ABANDONMENT.

In a suit for infringing complainant's right to the use of the words "Old Crow," as applied to whisky, defendants filed a cross-bill, which was dismissed by the trial court, which granted injunctive relief to complainant. Defendants appealed from each part of the decree, but in the appellate court their counsel announced that they would not ask affirmative relief, and the court did not consider that subject, but simply dismissed complainant's bill. *Held,* that defendants abandoned any claim to affirmative relief on the theory that they had any trade-mark.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 114; Dec. Dig. ⊙═100.]

14. JUDGMENT ⊙═715—CONCLUSIVENESS—ISSUES.

The Circuit Court of Appeals of one circuit, when determining what the Circuit Court of Appeals of another circuit decided in a former suit involving the same question, has no power to make new findings of fact inconsistent with the finding made by the latter court.

[Ed. Note.—For other cases, see Judgment, Cent. Dig. § 407; Dec. Dig. ⊙═715.]

Appeal from the District Court of the United States for the Western District of Kentucky; Walter Evans, Judge.

Suit by W. A. Gaines & Co., a corporation, against the Rock Spring Distilling Company and another. From a decree of dismissal, complainant appeals. Reversed and remanded.

Appellant, Gaines & Co., is a Kentucky corporation. Appellee Rock Spring Distilling Company is also a Kentucky corporation, and appellee Rosenfield is the licensee and operator of its distillery, and is a citizen of Kentucky. The appellant will be referred to as plaintiff; the appellees, as defendants. The litigation involves a controversy over the words "Crow" or "Old Crow" as a trade-mark for whisky. Plaintiff filed its bill in the court below, alleging its trade-mark right in these words, and claiming that defendants were infringing. The answer denied the existence of the right claimed, and set up as a bar a decree rendered against plaintiff in the United States District Court at St. Louis, under mandate of the Circuit Court of Appeals for the Eighth Circuit. The answer claimed privity between the Hellmans—the defendants in that case—and these defendants. A plea of former adjudication was held good. [C. C.] 179 Fed. 544. After replication filed, proofs were taken, including, by stipulation, all proofs in the Hellman Case; and, on final hearing,

the bill was dismissed. 202 Fed. 989. From the pleadings and proofs, these facts appear, either without dispute or beyond fair question:

Woodford county, Ky., is not far from Bourbon county, and is in the heart of the limestone formation, "blue grass" country. This general region has always been and is the center of the distilling business for the best known Kentucky whiskies. The water from the limestone springs—whether or not it is really better than other waters for making whisky—in the early days was thought to be of unique purity and essential to the highest grade of the distilled product. Three brands, among those most advertised and so most widely known now for a generation, are made within a few miles of each other, in Woodford county, along Glenn's creek—"Taylor," "Pepper," and "Crow." For a long period before 1855, James Crow was a practical distiller in the Glenn's Creek neighborhood. He did not have a distillery of his own, but was employed by various distillers—for some years before Crow's death, in 1855, by Oscar Pepper (except for the last year or two, and even then Crow retained some supervision for Pepper). He was reputed to be the first man in Kentucky to make a sour mash whisky, and he had a high reputation as a skillful distiller. During his years at the Pepper distillery, he made a large quantity of whisky. This whisky came to be called by his name as "Crow," or, as it aged, "Old Crow," whisky, and it acquired, by that designation, a reputation for good quality. At his death a considerable quantity was in existence, both where it had been scattered upon the market and where it was aging in the distiller's possession. During the succeeding years, it continued to have a market reputation and represent a high standard, under one or the other of these names. After Crow's death, Oscar Pepper, at the same distillery and with the same formula, continued to make a whisky which some witnesses say he continued to call "Crow." He died about 1865. In 1866 or 1867, the Pepper distillery was bought by Gaines, Berry & Co. They employed, as distiller, a man who had been a foreman for Crow, and who knew his formula and methods, and their product they called "Crow," or "Old Crow." They were succeeded in the business by W. A. Gaines & Co., first a partnership, and then the plaintiff corporation. Since such adoption by Gaines, Berry & Co., these words have been continually used by plaintiff and its predecessors as a trademark, vast sums of money have been expended on advertising the brand and the trade-mark, and the brand, under that name, has for many years been one of the best known in the country. All the other distilleries where Crow worked, and which so might have had special rights in the name, have now, for 60 years or more, not questioned the exclusive rights of the Pepper distillery and its successor; and while, doubtless in the '70's, and perhaps in the '80's, there were some instances of trespassing which were not attacked, plaintiff's right was even then generally observed, and now, for 25 or 30 years, has not been seriously challenged—save for the Hellman use.

The witness Mida, who conducts the Bureau of Registration for brands and trade-marks regarded as authoritative by all the liquor trade, and who has published, since 1878, "Mida's Criterion," the recognized price list of "all brands and all ages" of liquor, testifies that "Old Crow" has always and everywhere been considered the Gaines brand, and is universally understood to refer to whisky made at the Gaines Old Crow distillery. This testimony is undisputed—excepting the Hellman use, if that is an exception. It further appears that Gaines & Co., in 1882, registered, as a trade-mark, "Old Crow," alleging its use as a trade-mark "since 1870." Again, in 1904, plaintiff duly registered as a trade-mark the words "Old Crow," alleging its continuous use, by plaintiff and its predecessors, since 1835. Again, in 1909, and under the act of 1905, plaintiff duly registered the same trade-mark, alleging that it had been used since 1835, that the class of merchandise to which it was appropriated was "distilled alcoholic liquors," and that the particular description of goods comprised in the class upon which the trade-mark was used is "Straight Bourbon and Rye Whisky." This last registration is the only one alleged in the bill in this cause, and upon it jurisdiction depends, since there is no diverse citizenship.

Since it is admitted that defendants are using the name "Celebrated Old Crow" upon whisky not made by plaintiff, the right to an injunction would be clear, except for the defense and counterclaims made in the Hellman Case,.

taking effect here either by virtue of the inherent force of the facts there and here appearing, or through the operation of the rule of adjudication. In that case the defendants Hellman filed a cross-bill, alleging their own prior and superior right to the trade-mark "Old Crow," and asking for appropriate relief. By the proofs it appeared that prior to 1867, and perhaps as early as 1863, the Hellmans had made some shipments of whisky which they invoiced under the name of "Crow," and which were contained in barrels stamped with the picture of a crow, and with the words "P. Crow" or "J. W. Crow"; that they had distributed to their customers signs advertising "Celebrated Old Crow Bourbon"; that they were not distillers, but were wholesalers or jobbers; and that the whisky which they sold under that name had no connection with the Kentucky "Old Crow," but was a "blend," and made by them on their own premises, while the plaintiff's product was a straight whisky, and its trade-mark was never applied, with its approval, to anything else than its product. Upon this general situation, the District Court, at St. Louis, found the facts and the law in plaintiff's favor, awarded to it the usual injunctional relief, and dismissed the cross-bill of defendants Hellman. Gaines v. Kahn (C. C.) 155 Fed. 639. Both parties appealed; but the Hellmans dropped their appeal from the dismissal of their cross-bill, whereby whatever adjudication was carried by such dismissal became final. The opinion of the Court of Appeals is reported in Kahn v. Gaines, 161 Fed. 495, 88 C. C. A. 437. Its precise effect, we must hereafter consider. It directed that the decree be reversed, and that plaintiff's bill be dismissed; and this was done.

E. F. Trabue, of Louisville, Ky., and J. L. Hopkins, of St. Louis, Mo., for appellant.

W. T. Ellis, of Owensboro, Ky., and Luther Ely Smith, of St. Louis, Mo., for appellees.

Before WARRINGTON, KNAPPEN, and DENISON, Circuit Judges.

DENISON, Circuit Judge (after stating the facts as above). [1] 1. The first objection which plaintiff's alleged trade-mark rights must meet is that the words are descriptive, and so incapable of becoming a true trade-mark. If nothing were involved except the effect of the 1909 registration, this objection might be passed without decision, since the application for registration indicates use for more than 10 years before 1905, thus perfecting rights which might have been imperfect when the use began, and would have so continued except for the statute (Davids Co. v. Davids, 233 U. S. 461, 34 Sup. Ct. 648, 58 L. Ed. 1046; Nashville Co. v. Coca Cola Co., 215 Fed. 527, 529, 132 C. C. A. 39); but it is impossible wholly to separate the force of this registration from the underlying broader question, because rights prior to this registration are indirectly involved.

[2] During the lifetime of the distiller Crow, it seems clear enough that to call his product by his name could not amount to the adoption of a valid trade-mark; the use of the name was descriptive, rather than arbitrary, and a manufacturer cannot thus exclude all others. Such use might give rise to quasi exclusive rights on the secondary meaning theory; but this theory is not alleged. The same situation, apparently, must continue after Crow's death, and in reference to whisky which had been manufactured by him during his life. The necessary meaning of the words, as merely describing the article or stating the name of the maker, would seem to merge and destroy any otherwise possible implication that they were an arbitrary symbol of origin. As the making of whisky after Crow's death, but by the same formula and

methods, was continued by Pepper or by Gaines, and as it continued to be called "Old Crow," this appellation would gradually change its character. It at once ceased truly to personify the maker; it did not immediately become merely arbitrary. As the trade lost the sense of Crow's personality, as he became less real and more traditional, as no one else of the same name challenged the growing right, and as with Crow's personality fading there must also fade the vague descriptive effect of using his formula, the words "Old Crow" would become less descriptive and more arbitrary, and after a period of such unchallenged use they would become dominantly and substantially a mere symbol of origin. Whether this right of exclusive appropriation as a trademark had matured in 1866 or 1867, when Gaines, Berry & Co. began the use, or matured in 1870, the date named in their first trade-mark registration, or matured at some other date, is not now material. The facts seem to show an unbroken development of the type which the courts had recognized, but which had not been effectuated by statute until the law of 1905. Words which were at first essentially incapable of exclusive appropriation were continually used as descriptive by the only one who could truthfully make such use, until, by change of circumstances and by long acquiescence, they had come to indicate, and indicate only, a particular product of a particular manufacturer. It might be otherwise, if the words had originally been more purely descriptive of quality or method; and it may be that some person named Crow would even yet have a measure of right to call his product "Crow." We do not meet either of these questions; and, in what has been said regarding the capability of the name for exclusive appropriation, we have, for the time being, disregarded whatever force the St. Louis use by Hellman may have.

[3] 2. When we consider the claim that the Hellman decree is a bar to any relief in this suit, we first meet the objection that there is no privity of parties. We must think that privity sufficiently appears. The parties defendant in that case, at the time of its commencement, had been the two Hellmans, who were partners. Pending the suit, one partner died, and his administrator, Kahn, was substituted. Later, but still pending the suit, the entire business of the Hellman Bros. was transferred to the just organized corporation, the Hellman Distilling Company, and by supplemental bill this corporation was made defendant. The corporation was therefore a party to the suit at the time of the final decree. During the existence of the partnership of Hellman Bros., it had leased the distillery of the Rock Spring Distilling Company, near Owensboro, Ky., and as lessee it had manufactured whisky there in 1904. The Hellman Distilling Company, as such lessee, continued such manufacturing in 1905, 1906, and 1907. In 1909 all this remained in bond in the distillery warehouse. In 1909, and after the final decree in the Missouri case, the Hellman Distilling Company contracted with the Rock Spring Company, and with Rosenfield, as its lessee, for the further manufacture of whisky, and for the bottling in bond of the 1904 stock, and for the use upon such bottles of the brand or label "Hellman's Celebrated Old Crow." The Hellman Company gave to defendants a bond of indemnity to protect them against plain-

tiff's claims; in using this brand or label, defendants are acting for and in behalf of the Hellman Distilling Company; and the right of that company to use this brand on this article is the very thing in controversy. The former decree must be given the same force and effect as if the Hellman Distilling Company were the nominal, as it is the real, defendant here. Kessler v. Eldred, 206 U. S. 285, 27 Sup. Ct. 611, 51 L. Ed. 1065.

[4] 3. Plaintiff next urges, by way of escape from the claimed force of the Hellman decree, and even if that decree is to be considered as an adjudication that the plaintiff had no lawful title to the trade-mark, yet that, since the only use there involved was upon a blended whisky, while the use here involved is upon a straight whisky, a judgment that plaintiff had no trade-mark valid against a blended whisky would not be a judgment that plaintiff had no trade-mark valid for straight whisky. Disregarding, for the present, such limitations as for the purposes of this suit must be thought to have been imposed on plaintiff's rights by the peculiar form of the 1909 registration, and with reference only to the general question and the general rule, we cannot be satisfied with the theory which would thus interpret and then limit the effect of the Hellman decree. The general rule is clear that a common-law trade-mark for one article extends to another article of the same descriptive properties; the difficulties come in applying this limitation, "of the same descriptive properties." The distinctions between a straight whisky and a blended whisky have given rise to much controversy in other legal fields; but it seems to us clear that, whatever the extended classifications and subclassifications of the Patent Office practice may contemplate, neither the common law nor the registration statute can intend such confusion as must result from recognizing the same trade-mark as belonging to different people for different kinds of the same article. Established trade-marks directly indicate origin; but, if they have any value, it is because they indirectly indicate kind and quality, and to say that the seller of a blended whisky might properly put upon it a mark which was known to stand for a straight whisky, or vice versa, would be to say that he might deceive the public, not only as to the origin, but also as to the nature and quality, of the article. The decided cases do not permit a trade-mark like this to be thus divided as to its subject-matter; [1] and we must think that whatever was adjudicated regarding plaintiff's title to its trademark applies to its use on both kinds of whisky.

[5] 4. It is next urged that the Eighth Circuit decree may be reconciled with granting the relief now sought, and upon the theory that trade-mark rights may be limited in territory, and that plaintiff might have the right to this trade-mark for whiskies throughout the country generally, while the Hellmans might have an exclusive right to the

---

[1] Coffee and cocoa, Baker v. Harrison (Ct. App. D. C.) 138 Off. Gaz. 770; toilet brushes and tooth brushes, Florence Co. v. Dowd (C. C. A. 2) 178 Fed. 73, 101 C. C. A. 565; soda and baking powder, Layton Co. v. Church (C. C. A. 8) 182 Fed. 35, 104 C. C. A. 475, 32 L. R. A. (N. S.) 274; axes and shovels, Collins v. Ames Co. (C. C.) 18 Fed. 561 (Mr. Justice Blatchford); tobacco and cigarettes, American Co. v. Polacsek (C. C.) 170 Fed. 117 (Coxe, Circuit Judge).

same words as a trade-mark for the same article in St. Louis and the Southwest, thus being given the field which they claimed they had first exploited and reduced to possession. This suggestion presents two conflicting theories of trade-mark origin and right,—and we speak now only of marks which are so-called "technical" trade-marks. One theory is that the right arises from adoption,—from a kind of creation or discovery followed by appropriation. Whether the right is perfect at the instant of adoption, or whether there first must be sufficient use upon the goods to create for the mark a meaning among that part of the public which begins to purchase, is a detail which would not usually be important. According to this theory, if the right is once acquired by prior adoption, it is by its very nature exclusive of all later similar rights which might otherwise be acquired by similar adoption; and from that theory it would seem to follow that one who first adopts the mark and applies it to his goods in interstate commerce, and who extends his business into new localities, until, in regular course, his business may cover the country, may prevent the use of the mark by another later user, even though that other has adopted the mark in good faith, and in his particular field has given it identity with his goods. How much diligence on this theory the first user must employ in extending his business to get the full benefit of his initial right need not now be considered. The other theory is that no right is perfected until the mark has been used to such an extent that it has come to have a meaning to the particular purchasing public as to which a controversy arises, and that the duty of courts of equity to enforce such rights depends essentially upon the duty of protecting this public against being misled. From this theory it will follow, or it may follow, that the later adopter, who has brought it about in a given locality that the mark indicates to the public that the goods are of his manufacture, may thereby himself acquire a trade-mark right or its equivalent, affirmatively enforceable in that locality and among that public, even against the first proprietor.

We do not find it necessary to consider or to attempt to decide the question so presented. For the purposes of this case, and without intimating any opinion, we give the first appropriator the benefit of the doubt and assume that his title is prima facie country-wide and exclusive against all others, and that as against all who have no special and superior equity he is entitled to carry his trade into the new territory and there to enforce his exclusive right. However, the existence of this general or prima facie exclusive right is not inconsistent with an inability to enforce it against some persons and under some circumstances. Instances may arise where the affirmative conduct or the laches of the first appropriator, and with reference to what he was at first entitled to call an infringement, has been such that on the principles of estoppel a court of equity cannot tolerate that he should enforce against the later user the right which might have been originally perfect. This subject is more fully discussed and the reasons which lead us to this conclusion pointed out, with some reference to the decided cases, in our opinion in the Rectanus Case, 226 Fed. 545, —— C. C. A. ——, this day decided. Under these considerations, and upon

reference to the pleadings and the proofs in the Hellman Case, we conclude that the latter case is of the class where the refusal to give an injunction to the first appropriator of the mark may be justified upon the ground of his estoppel; and so this ground of support must be considered in determining what is the true basis of that decree.

5. Is the Eighth Circuit decree a judgment that the trade-mark, in its general, prima facie, affirmative aspect, belonged to the Hellmans by prior appropriation? This is the interpretation claimed by defendants. The language in the body of the Circuit Court of Appeals opinion is consistent with that interpretation, but the last paragraph indicates that the two judges (only two sitting) did not unite in putting the decision on this ground. When we turn to the record for further light, we find, first, that the defendants' cross-bill claiming the trade-mark ownership was dismissed, and that the dismissal became final. If it had been even seriously contended by defendants that their early use of the words was effective to vest a trade-mark right therein, surely there would not have been acquiescence in the dismissal of the cross-bill. It was apparent, then as now, that affirmative title to the trade-mark would have been of great value to defendants, if they could maintain that position. We find, second, that there was in the record practically nothing indicating that the Hellmans ever pretended to adopt or claim these words as their trade-mark. They stamped some barrels with the words "P. Crow" or "J. W. Crow"; but no person of this surname had ever been connected with the Hellmans. The Crow, or Old Crow, which, in 1863, had been manufactured in Kentucky for 20 years or more, was at least considerably known on the market. No reason has ever been suggested in this litigation, and we can think of none, why they should put this name on their barrels, unless they intended to indicate that the whisky was that made by Crow of Kentucky. Unless the selection of this name meant that it meant nothing. Witnesses for the defense frankly stated that in those years it was nothing unusual for jobbers or blenders of whisky to use well-known brands belonging to others, and that, if the initial of a proper name was changed, this was thought sufficient in morals to remove any objection to the appropriation. This may be the genesis of the otherwise unexplained use of "P." and "J. W." [2] The Hellmans also used advertising signs "Celebrated Old Crow Bourbon." From the record, we must doubt whether these signs antedated 1870. But if they did reach back to 1863, and if they referred to the blend or mixture which the Hellmans produced, it was neither "Celebrated," nor "Old," nor "Crow," nor, unless by chance, "Bourbon." [3] It was made by mixing colors and flavors with neutral spirits or high wines, or, sometimes, straight whisky; but, if the latter, it was whatever they happened to have on hand. Defendants' witness says, "Any brand would do." Records

[2] One of the stencils was "J. Crow-Bourbon-Paris, Ky."—a plain declaration that "Crow" was a maker's name, and not a Hellman trade-mark; and as there never was any "Crow" in "Paris, Ky.," the intent seems clear enough.

[3] Assuming that, at that date, "Bourbon" fairly meant a corn whisky from somewhere in Kentucky, even if not from Bourbon county.

which seem to be complete show that during the seven years from 1863 to 1870 the Hellmans sold, of this "Crow" whisky, an average of less than eight barrels per year.

In considering whether their use was of a trade-mark character, the peculiar nature of their business and their markings must not be over-looked. The brands or marks on whisky are usually those of the orig-inal manufacturer. The dealer or jobber may handle many well-known brands, and may mark his own name upon the packages or upon the advertisements; but this does not indicate that he claims the brands as his, or that he is acquiring a' trade-mark right therein. While the stencils on the barrel and the glass signs carried the name "Hellman & Co.," they did not say "manufactured by," or that Hellman & Co. were manufacturers or distillers, nor were they in any way inconsistent with mere sale by Hellman as jobber of a well-known brand made by some one else. The thus described nature and character of the Hell-man early use might not always be thought sufficient to initiate and support even a defensive right; but they were so regarded in the for-mer decree, and it is immaterial whether we would independently reach that conclusion. It did there appear that the Hellman use thus began and continued for seven years before 1870, or four years before 1867, the earliest date to which, under the pleadings, plaintiff could then re-sort, and that after 1870 it continued, increasing somewhat, although remaining comparatively small, and continuing without challenge from plaintiff until 1904. It may well be that, even if plaintiff did not know of this use and acquiesce, it was legally chargeable with such knowl-edge and acquiescence for many years, and that in 1904 the use would have matured into a possession of which a court of equity would not deprive defendant. At any rate, we think that is the theory upon which the former decree should be considered to stand; and, accord-ingly, it adjudicates such defensive right and nothing more. As in-terpreted by Judge Lacombe in the Baltimore Club Case (Carroll v. McIlvaine [C. C. A. 2] 183 Fed. 22, at page 28, 105 C. C. A. 314), this right does not go beyond what has actually been "reduced to pos-session" by defendant, and does not extend to any whisky not mixed or blended, so as to be of the same general type as that which defend-ants had been making, or to trade or territory which they were not sell-ing when that bill was filed. Such difficulties as there may be in drawing the exact line of its effect are not here involved, because the infringement here sought to be enjoined is in another locality and of another character. This limitation—to blended whisky as distinguished from straight—thus imposed on defendants, is not inconsistent with our earlier holding that a trade-mark cannot be so divided. This lim-itation is not of the trade-mark right itself, but of the fraction thereof which has been lost.

[6, 7] 6. The validity of plaintiff's registration under the act of 1905 is attacked upon two grounds: First, that the registration was for-bidden by section 5, because the mark was identical with a "known trade-mark owned and in use by another and appropriated to merchan-dise of the same descriptive properties," viz., the Hellman trade-mark; and, second, that it would be invalid under that provision of section 21 which relates to certificates of registration fraudulently obtained.

We pass by the plaintiff's contention that the validity of registration cannot be collaterally attacked, but must be directly reached under the provisions of section 13, which provides for the cancellation of the certificate if it is made to appear that the registration was unlawful; and we do so because we conclude that the registration of a word capable of exclusive appropriation has no effect upon the substantive rights of the parties, excepting its evidential force to make a prima facie case of title. We find nothing in the act purporting to cut off or impair any substantive defense which would have been open to the defendant if there had been no registration, except in so far as it perhaps may affect the character of registrant's title to a descriptive word of a secondary meaning (Nashville Co. v. Coca Cola Co., 215 Fed. 527, 529, 132 C. C. A. 39), and this effect is not now involved. If, then, the law does not otherwise indicate the intention to cut off or embarrass ordinary defenses by one who has not been heard in the registration proceedings, that intention cannot be inferred merely from the insertion of a provision by which a hostile party can secure the cancellation of a certificate and so destroy even its evidential force and its effect upon questions of jurisdiction as between different courts.

The first objection is that because the trade-mark "Old Crow" belonged to the Hellmans for use upon blended whisky, and because this is an article of the same descriptive qualities as plaintiff's straight whisky, the registration was forbidden. This objection must fall, when it is found, as we have held, that upon the basis of the former decree the adjudication does not establish the ownership of the trade-mark by the Hellmans, but only a defensive right sufficient to protect them against the remedy then sought, and that, if we go behind the adjudication and into the facts, the Hellman right is not enlarged.

[8] It is next said that the registration was "fraudulently obtained" because, before the application was made, the Eighth Circuit litigation had been finished, and yet the application falsely stated two things, the untruth of which had then been judicially established: (1) That the trade-mark had been continuously in use by registrant and its predecessors since 1835; (2) that no other person had the right to use the mark. The statement that the trade-mark had been in use since 1835 is not shown to be untrue to such extent and with such certainty as would be necessary to fix a fraudulent character on the application, within the meaning of "fraudulent" as used in this connection. The proof does not carry the use of the word back to a definite beginning. At Crow's death, in 1855, the name had been long used. No one undertakes to say how long. It was not important for plaintiff to prove that the use did extend back of, say 1850, and defendant did not undertake to prove that the use did not go as far as 1835. The period between 1835 and 1850 was not important, either for the purpose of registration or for the purpose of this suit. It is true that the use was of a character analogous to a descriptive use, rather than a strictly trade mark use, for a period which did not expire until an indefinite date, perhaps 1870, perhaps earlier; but this fact, with these surroundings, is plainly insufficient to make "fraudulent" the statement that the trade mark had been continuously used since an earlier period.

[9] The application says "that no other person * * * has the right to use the trade-mark." It had then been decided that, as against plaintiff's claimed exclusive right, the Hellmans could continue to use the words as they had been doing, viz., in their trade and territory and upon their blended product. The registrant thought to avoid this apparent conflict by limiting the registration to straight whisky only, and undoubtedly the application, when read together, is only a statement that no one else has the right to use the words upon straight whisky. We have expressed our opinion that a trade-mark cannot be so limited; but we see no reason why an applicant may not, if he wishes, confine his registration and its effect to such classes or subclasses of the article "of the same descriptive properties" as he may select,[4] or why he thereby necessarily abandons such rights as he may have to the use of the mark upon other subclasses of the same article. It is true that the jurisdiction in this case depends upon this registration; but the decree sought is confined strictly within the limitations of the registration, viz., it affects straight whisky only, and it is no concern of defendants if the registration might have been broader. The application, obviously, did not state the whole truth regarding the mark; but, as far as it stated anything in this respect, it was carefully accurate. It claimed only that exclusive right of use which remained unimpaired by the Hellman decree.

[10] It is also said that the registration was fraudulent because the Hellmans' well-known interests were, by silence, concealed, whereby they were not summoned as adverse claimants, and lost their chance to be heard. The registration statute contemplates that adverse claimants, when known, shall have notice and an opportunity to oppose. There is little reason to doubt that this application was carefully so shaped as to avoid any necessity for such specific notice, and if the effect of the registration was to take away any right of use which the Hellmans actually owned, it might well be that any intentional failure to disclose facts which might give another the right to be heard, would be fatal to the proceeding; but, with due regard for the limited effect of the registration, there is no occasion for so strict a rule in determining "when the certificate is fraudulently obtained." Whatever new rights, of evidence or of forum, plaintiff was getting, were confined to its trade-mark used upon straight whisky; in that use, the Hellmans had no concern. Their failure to receive notice impaired no right of theirs; and it follows that the deliberate limitation and shaping of the registration so as to avoid conflict with their claims was not fraudulent, as against them or as against the public.

[11] We think the plaintiff was entitled to an injunction against the continuance of what defendants were doing, viz., using the names "Crow" or "Old Crow" in connection with straight whisky not made by plaintiff. Extending the injunction in the broad terms of the prayer of the bill might not only cause confusion with rights secured by the Eighth Circuit decree, but might go beyond our jurisdiction in this

4 Kohler v. Beeshore, 59 Fed. 572, 8 C. C. A. 215, Richter v. Reynolds, 59 Fed. 577, 8 C. C. A. 220, and Pittsburgh Co. v. Diamond Co. (C. C.) 85 Fed. 637, pertain to the word itself, not to its use.

case. That jurisdiction is confined to protecting the class of merchandise specified in the certificate of registration, "straight Bourbon or rye whisky"; and if, upon the principles herein declared, plaintiff would be entitled to any broader measure of relief, this limitation of the injunction will not prejudice proceedings therefor in a court whose jurisdiction does not depend solely upon the registration. The difficulty of distinguishing between the results of defendants' wrongful use of these names as compared with the results of a rightful use make the case inappropriate for an accounting. Ludington Co. v. Leonard (C. C. A. 2) 127 Fed. 155, 157, 62 C. C. A. 269.

The decree below is reversed, with costs, and the case is remanded for the entry of a new decree consistent with this opinion.

## On Petition for Rehearing.

PER CURIAM. An application for rehearing points out certain supposed errors in the opinion, and their existence and effect should be considered:

(a) We assumed that the distinctions between straight whisky and blended whisky and their attendant market conditions had existed, substantially as at present, from the commencement of the period under consideration. Undoubtedly, this assumption somewhat colors the discussion in the opinion. This assumption is now said to be wrong, and our attention is directed to the decision of President Taft in the controversy arising under the Pure Food Law, and to its recital of facts in the trade history. This recital shows that prior to the Civil War, the greater part of all whisky sold in the usual retail methods had been, in different ways, purified and refined after leaving the original distiller, and had also been artificially colored and flavored —all by the methods then or later known as rectifying and blending. Only at about the time of the Civil War was it discovered that whisky, by aging in charred barrels, could be satisfactorily refined and colored, and, in a sense, flavored, without any secondary treatment. Thus and then what is now called "straight" whisky first came into existence.

Upon a review of the opinion, we cannot see that its conclusions are seriously affected by this correction of our misapprehension. The sales of "Old Crow" whisky made before 1865 by the predecessors of Gaines & Co. would have been more largely to rectifiers and less to the consumer than we had assumed would be natural, and so much reputation as the name had would be more among rectifiers and less among the users; but this is only a matter of degree. It comes to saying that the standing and reputation which grew up with the name were more local and less widespread than would have resulted under present day conditions; and correcting this matter of degree according to the fact will bring no different result. Even if up to a given date, say 1867, rectifiers had been the sole purchasers of the distillery product, and had been the only class to whom the product was known as "Crow" or "Old Crow," this would not subject the growth and development of the trade-mark right to any different principles.

(b) The opinion, in a note, refers to the use by the Hellmans of the brand "J. Crow, Paris, Ky." This particular brand was in fact not used by the Hellmans, but by another rectifier in St. Louis. It may be noted, also, that at the same time (in the 60's) a Cincinnati house was marking some of its output "Crow."

This correction, and its resulting inferences, do not help the Hellman case. If it is improbable that such a name as "Crow" was adopted by one rectifier merely by chance, it is rather incredible that each of three rectifiers, in communities where Kentucky whiskies, came to market, fortuitously hit on the same unusual trade-mark; and to find that in 1865 three dealers were using a name which had become at least somewhat known in a near-by center of original production many years before confirms the conviction that the name must have acquired reputation enough to make it worth taking, or else that it had become at that time indicative of a class or type of product.[5]

(c) It is said we were in error in assuming that "Old Crow" had anything to do with the age of the whisky; but that, in fact, this word refers only to the age of the man, Crow. This may be so; but the same mistake would have been natural in the 60's to those who heard the name, but did not know of the man; and as to its effect on the trade-mark development discussed in the opinion, it would not be important whether the natural inference that "Old Crow" implied age in the whisky was the right or the wrong inference.

The petition assures us that there was no "implication of age in applying 'Old Crow' to the Hellmans' blended whisky," and that it was used as "Old Hickory" might have been. If so, the reference was to an individual; and as no man of this name or so-called appears ever to have been known, except the Glenn's creek James Crow, it would follow that the Hellman use must have been fraudulent.

[12] (d) The opinion is criticized because we hesitated to accept, at its face value, the Hellman testimony regarding the extent of their Old Crow sales, the use of their advertising signs, etc., before 1867. There is a considerable volume of this testimony, but it consists almost wholly of unaided recollections of dates 40 years old; and it is that class of testimony which, by decisions familiar in patent cases, the Supreme Court has refused to accept. True, there is in a trade-mark case no initial presumption of validity to be overcome; but the principles for determining the evidential value of testimony cannot differ according to the subject-matter of the case.

[13] (e) The petition points out that the opinion, after stating that the Hellmans appealed from the St. Louis decree dismissing their cross-bill asking affirmative relief, then erroneously states that they dropped this appeal "whereby whatever adjudication was carried by such dismissal became final." The facts are that the decree below directed an injunction against the Hellmans on the original bill and

---

[5] The latter seems to be the interpretation expressly adopted by the Eighth Circuit opinion in saying that the Hellmans at this period "employed these words as descriptive terms." Kahn v. W. A. Gaines & Co., 161 Fed. at page 502, 88 C. C. A. at page 437.

the dismissal of their cross-bill; that they appealed from each portion of the decree; that in the Court of Appeals their counsel announced that they would not ask affirmative relief, and the Court of Appeals did not consider that subject; and that the decree below was reversed, and a new decree was entered below, simply dismissing the bill. It is not of controlling importance in what technical situation this final dismissal left the rights claimed by the cross-bill. The persuasive thing is that the Hellmans abandoned any claim to relief on the theory that they had any trade-mark; and it is this conduct that helps to interpret the Eighth Circuit litigation, and tends to support our conclusion that such litigation should not be taken as an adjudication that the Hellmans had adopted and had become the owners of the trade-mark.

[14] (f) The petition assumes that this court has made a new finding of facts inconsistent with the finding made by the Court of Appeals in the Eighth Circuit. Of course, if this assumption were true, our opinion would be wrong. We intended only to determine what was the real thing decided in the former suit, and so what was the thing adjudicated; and it became necessary to separate, as best we could, those conclusions of the court upon which its action was based, from those recitals of the judge writing the opinion, in some of which, at least, the other judge sitting apparently did not concur. Further than this we had neither the right nor the disposition to go.

The other criticisms which the petition makes on the opinion we have considered, and we think they are either based upon misapprehension or else are sufficiently covered by the opinion itself.

The application for rehearing is denied.

