## MARSHALL VENTILATED MATTRESS CO. v. D'ARCY SPRING CO.

(Circuit Court of Appeals, Sixth Circuit. May 2, 1922.)

Nos. 3568, 3574.

1. **Patents ⬤⇒328—1,246,081 for spring cushion, held valid and infringed.**

The Genge patent, No. 1,246,081, for a spring cushion or mattress, claims 6 and 7, *held* valid and infringed; claims 8 and 9 *held* void for lack of invention.

2. **Patents ⬤⇒328—1,172,344, for cushion structure, held not infringed.**

The D'Arcy patent, No. 1,172,344, for a cushion structure, claim 3, *held* not infringed.

3. **Trade-marks and trade-names and unfair competition ⬤⇒68—Complainant held entitled to injunction against unfair competition.**

Complainant, manufacturer of a spring known as the "Marshall spring," though the patent on the same had expired, *held* entitled to an injunction against a circular issued by defendant, headed "Marshall Springs Now Manufactured by" defendant, as at least suggesting that the business of making the springs had been taken over by defendant.

Appeal and Cross-Appeal from the District Court of the United States for the Southern Division of the Western District of Michigan; Clarence W. Sessions, Judge.

Suit in equity by the Marshall Ventilated Mattress Company against the D'Arcy Spring Company. From the decree, both parties appeal. Modified.

Taylor E. Brown, of Chicago, Ill., for plaintiff.

Otis A. Earl, of Kalamazoo, Mich. (Chappell & Earl, of Kalamazoo, Mich., on the brief), for defendant.

Before KNAPPEN, DENISON, and DONAHUE, Circuit Judges.

DENISON, Circuit Judge. The Marshall Company brought suit against the D'Arcy Company for infringment of the Genge patent, No. 1,246,081, dated November 13, 1917, for a spring cushion for mattresses, and alleged also infringement of trade-mark rights in the word "Marshall," and unfair competition in trade. The D'Arcy Company denied any trespass in these respects, and by its answer and counterclaim alleged infringement by the Marshall Company of patent No. 1,-172,344, dated February 22, 1916, issued to D'Arcy for a cushion structure. The District Court found that plaintiff must fail upon the trade-mark and unfair competition issues; that claims 6, 7, 8, and 9 of the Genge patent were valid, and were infringed by defendant; and that claim 3 of the D'Arcy patent (the only one sued upon) was not infringed by the plaintiff. Both parties appeal.

[1] The Genge patent is illustrated in the drawings as applied to a mattress; the device which is said to be an infringement is an automobile cushion, and the latter form only need be considered. The patent has to do only with the wire and spring framework and construction underneath the upholstering. It shows an upper and lower horizontal frame; the lower one carries a mass of closely adjacent upright spiral springs, arranged in longitudinal rows parallel to the front of the cush-

ion. Each frame is approximately rectangular, though with rounded corners, and is made of a heavy wire, bent into the appropriate shape. In connection with the front wire of the upper frame, which constitutes the upper front edge of the cushion, Genge has what he calls a truss. It is a wire of about the same quality as the front edge wire, lies back of it in the same horizontal plane, and perhaps 3 inches distant, and for the central half of its length is parallel to the front wire. Its ends are inclined forward in the same horizontal plane until they meet and join the frame at the front corners. The central and parallel portion of this truss is connected or tied to the front rod by three wire cross-ties, which Genge calls struts. The truss extends back over and lies along the top of and engages with the second row of springs, and its attachment to the front rod is rigid enough so that it sinks down with the front rod in a unitary way when the weight of the occupant comes upon the cushion. It thus tends to maintain the proper relation between the front part of the cushion and the part further back.

Based upon this described structure, Genge makes the following claim:

"(6) In a mattress or cushion comprising a base defining the bottom outline of said mattress or cushion, resilient, elastic means supported on said base, a top border frame defining the top outline of said mattress or cushion, said top border frame having a reinforcing truss connected to one side thereof, said truss overlying and engaging a part of the resilient elastic means adjacent that side of the border frame to which it is connected, and including inclined members attached to the frame at the ends of the side which it reinforces."

The controversy over the validity of this claim has involved the particular meaning of "truss." We cannot think it is a completely appropriate term, when applied to these wire structures. The dominant idea of a truss is that its members are fitted to interpose against the expected strain their capacity for resistance to longitudinal compression and are sufficiently rigid so that they will not buckle. Of course, any wire which can be easily bent into the form of this top framework and truss has a limited capacity for resisting longitudinal compression without buckling; and there is a very imperfect analogy between the performance of these parts and a typical truss in a building or bridge construction. However, the analogy is not fully lacking, and in these devices the distinction between the mere cross brace and the form which Genge calls a truss is not without importance. It is apparent that, if the so-called truss did not have inclined ends, but was for its whole length parallel to the front edge wire, and if each end was firmly attached to the side wires, and it was fairly rigid, it would, when taken in connection with other similar cross braces further back, or with the rear edge of the frame, serve as a truss for the front edge wire. There is no inherent necessity that any member of a truss structure be diagonal. Square or lattice trusses are familiar, though perhaps they usually have diagonal members also. In such a structure the degree of truss effect would depend upon the degree of rigidity of the side wires and of their corner joints with the front edge wire. Unless this rigidity were sufficient, the side wires would tend to bend at the ends of the cross brace, and so there would be a yielding after the cross brace or square truss had exhausted its effect.

Regardless of the prior printed art, it is not to be doubted that the defendant, long before the Genge patent, had made in large quantities spring cushions, which in this part of the structure were precisely like those now said to infringe, excepting that it had used this completely parallel cross brace or square truss; and the only question of validity, therefore, is whether there was patentable invention in angling the ends of this cross brace forward and attaching them to the ends of the sides.

It is true that there would not ordinarily be invention in merely substituting a truss with angling members for a truss with rectangular members; but Genge was not only working in a field of imperfect analogy, as above pointed out, and in one where a great variety of cross bracing had been tried without developing this peculiar application, but he also obtained, at least in theory, from his peculiar angling form two new results. He secured some benefit from interposing the direct endwise thrust resistance of the angling members of his truss as against the tendency to pull the front corners nearer together if the front edge wire should bend, and he also permitted the second row of springs, with which the truss engaged, to yield downward with the front edge or as on a hinge, in a manner or to an extent which would not occur with the completely parallel brace or truss. A combination of some measure of truss effect with some additional freedom of yielding in the front part of the top indicates such a probability of useful interdependent action that we cannot say it was nonpatentable. We therefore agree with the District Court that this claim 6 was valid, and the same conclusions must follow as to claim 7.

Claims 8 and 9 are, in effect, broader. True, they have an additional apparent limitation calling for the cross struts connecting the truss wire with the front edge wire; but such cross connections were present commonly in many earlier structures, including that manufactured by defendant, and this element cannot serve as a limitation importing patentability. On the other hand, these claims omit the requirement that any portion of the truss rod should be inclined toward the front rod and attached thereto, and thus omit the only element of invention which we find in the structure, so far as involved in this case. They cannot be limited to a truss having these inclined ends, unless we overlook the distinction which was evidently intended to be made. Without such limitation these claims read directly upon the earlier manufacture of the defendant. We think they must be considered invalid.

Infringement of claims 6 and 7 is denied only because the inclined end members of the truss are not attached to the frame "at the ends of the side which it reinforces." In defendant's form the front edge wire and the side wires are continuous and turn the corners with a sharp and short bend, at which bent portion there will be increased resistance, against some strains. It is difficult to say that the front wire ends and the side wire begins exactly at the center of the curve; either wire may be considered as going around the bend. Defendant's inclined truss member is fastened to this side wire at or close to the point where the curve ends and straightens out into the side wire. There would be no little tendency for the side wires to bend and yield

at this point of contact, in case of an inward or outward strain upon the edge wire near its center; and this must be the test. The distance from the corner up along the end wire to the point of brace attachment determines the leverage exerted at that point and tending to produce a bend. In the patented form this leverage is eliminated, in defendant's form it is negligible; in the old noninclined form it is substantial. The avoidance of that tendency in the side wire to bend at the end of the brace or truss is the advantage which Genge attained by attaching his trusses at the ends of the front edge wire. It is not necessary to say just how far away from true parallelism the ends of the cross brace or truss may be inclined, without becoming the "inclined members" of the claim but we think that in this structure they are inclined down to and attached at the ends of the front edge wire within the meaning of claims 6 and 7.[1]

[2] In the cross-suit upon the D'Arcy patent, claim 3 is involved. It reads as follows:

"In a spring structure, the combination of the bottom border frame of wire, coiled springs, spring supporting bars secured to said border wire, a cushion cover having its lower edges wrapped around said border frame, and binding members of sheet metal curved in cross section disposed to embrace said bottom border frame and said cover, the distance between the edges of said securing members being less than the diameter of the border frame whereby the cover is secured to the frame and a metal binding edge provided for the cover."

It is sufficient to say of this patent and of the plaintiff's alleged infringing structure that, if we give to the claim the very narrow range of equivalents authorized by the small inventive step, if any, which D'Arcy took, we must conclude that there is no infringement. Discussion of the details would not be profitable. We agree with the conclusion of the trial court that in plaintiff's structure the lower edges of the cushion cover are not so "wrapped around" the border frame that the clips form "a metal binding edge for the cover," within the only meaning which can safely be given to that phrase.

[3] The remaining question is as to the claimed trade-mark rights and unfair competition. Defendant began its sale of this article by putting out a circular which contained an illustration of a cushion spring like that made by plaintiff, including the truss of the Genge patent. This circular was headed *"Marshall Springs* Now Manufactured by *D'Arcy Spring Company."* Counsel argue on the one hand that "Marshall" or "The Marshall Line" is plaintiff's general trade-mark applied to all its output of different articles and indicating origin, and, on the other hand, that "Marshall Springs" had become the trade-name of springs made under a certain Marshall patent, which at this time had recently expired. The testimony in this record is far from satisfactory as to whether the term "Marshall Springs" had acquired this significance in the appropriate market (see the Singer Case, 163 U. S. 169, 16 Sup. Ct. 1002, 41 L. Ed. 118), and we conclude that the case does not require a decision of the questions so argued. The only evi-

[1] In Plaintiff's Exhibit 3, showing defendant's structure, the clips at the ends of the truss have become loose, and do not show the original point of attachment. We assume that they were as illustrated in defendant's circular.

dence of any claimed violation of plaintiff's rights on this branch of the case is found in the issue of this circular. It was almost immediately discontinued, only a few copies having gone out. We think the plaintiff at the time of filing the bill was entitled to an injunction against this circular, for a special reason to be mentioned; and there is no occasion to go further. This reason is that the use of the phrase "now manufactured by" in this association suggests, if it does not indicate, that the business of making the Marshall springs had been taken over by defendant. The circular actually produced the impression upon some of plaintiff's customers that plaintiff had gone out of business. The fact that the circular had not been continued long after filing the bill hardly justified the complete dismissal of the bill as to this branch of the complaint. We think that for this dismissal clause of the decree there should be substituted an order for an injunction against this particular circular, and without further finding as to the broader complaint.

The costs would not be important on this issue, as the general costs of the suit were awarded to the plaintiff, and there were none separately applicable. We see no room for any accounting of damages as to this circular. Ludington v. Leonard (C. C. A. 2) 127 Fed. 155, 62 C. C. A. 269; Gaines v. Rock Spring Co. (C. C. A. 6) 226 Fed. 531, 543, 141 C. C. A. 287.

After the appeal record was filed in this court, the D'Arcy Company applied to have the case reopened for further proofs, and supported this application by affidavits tending to show that the truss with inclined ends in this combination was developed by engineers of the Nordyke & Marmon Company, and was communicated by them to Genge in the summer of 1916. The Marshall Company met this application by the claim that sufficient diligence in the discovery of this evidence was not shown and by proof of facts in explanation or denial of the applicant's affidavits. The issue is wholly one of fact. Without undertaking its decision in its present form, it is enough to say that the origination of the idea by the Nordyke & Marmon Company and its communication from that source to Genge at a date earlier than Genge's reduction to practice, do not appear with that degree of certainty or highly persuasive inference which would have justified us in reopening the case when the motion was filed, and in overlooking the D'Arcy Company's lack of diligence in not discovering this evidence for more than a year after its answer was filed, although it knew that the Nordyke & Marmon Company had been large users of this class of cushions, and although it made inquiry and search among several less prominent users. The motion to reopen must be denied.

The case is remanded, with directions to set aside the decree and enter a modified decree in accordance with this opinion. Each party will pay its own costs in this court.